**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

KYLE JOHN GRASSO,
*Defendant-Appellant*.

No. 10-50116

D.C. No.
2:07-cr-00755-
DDP-2

OPINION

Appeal from the United States District Court
for the Central District of California
Dean D. Pregerson, District Judge, Presiding

Argued and Submitted
December 6, 2012—Pasadena, California

Filed July 26, 2013

Before: Marsha S. Berzon, Sandra S. Ikuta,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Ikuta;
Partial Concurrence and Partial Dissent by Judge Berzon

# SUMMARY[*]

## Criminal Law

The panel affirmed convictions for money laundering, bank fraud, loan fraud, and conspiracy to commit loan and bank fraud stemming from a Los Angeles-based scheme to defraud mortgage lenders.

Affirming the conspiracy conviction, the panel held that the government presented more than sufficient evidence that the defendant knew the objectives of the fraudulent scheme.

Affirming the loan fraud convictions, the panel held that a jury could reasonably (1) conclude that the defendant knew that his false statements made to obtain a loan would ultimately influence a federally insured bank, and (2) find all the necessary elements to impose *Pinkerton* liability.

Affirming the bank fraud conviction, the panel held that there was ample evidence that the defendant was well aware of the scheme's fraudulent objective and that he intentionally furthered the fraud.

Because the money laundering convictions do not raise a merger problem with respect to either the loan fraud or bank fraud convictions, the panel defined "proceeds" to mean "gross receipts," and concluded that the "referral fees" the defendant received from Yoakum Drive and Benedict Canyon Drive transactions may be viewed as "proceeds" of the loan

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

and bank fraud. The panel on that basis rejected the defendant's argument that the government presented insufficient evidence that his money laundering charges were based on "separate and distinct" activity from the Yoakum and Benedict transactions. The panel therefore affirmed the money laundering convictions under 18 U.S.C. § 1956(a)(1)(A)(i).

Concurring in the affirmance of the conspiracy, loan fraud, and bank fraud convictions, Judge Berzon wrote separately to express concern that some of the majority's quotations could be read to suggest that a defendant may be convicted without participating in a conspiracy, if he simply has knowledge of the conspiracy and a "connection" to its participants. She dissented from the affirmance of the money laundering convictions because the government introduced no evidence that the Benedict- and Yoakum-related commission payments were made with profits, as opposed to gross revenues, of the overall bank fraud scheme.

---

## COUNSEL

Karen H. Bucur (argued), Laguna Hills, California, for Defendant-Appellant.

André Birotte Jr., United States Attorney; Robert E. Dugdale, Assistant United States Attorney; Jeremy D. Matz (argued), Assistant United States Attorney, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

IKUTA, Circuit Judge:

Kyle Grasso appeals his convictions for money laundering, bank fraud, loan fraud, and conspiracy to commit loan and bank fraud, stemming from a Los Angeles-based scheme to defraud mortgage lenders. We conclude that the evidence adduced at trial, taken in the light most favorable to the government, was adequate to enable a rational trier of fact to find the essential elements of each conviction. *See United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc). Accordingly, we affirm on all counts.

## I

We have already explained how this scheme operated in *United States v. Rizk*, 660 F.3d 1125 (9th Cir. 2011) (affirming conviction of Lila Rizk, a real estate appraiser in the scheme and one of Grasso's co-defendants). Therefore, we provide only a brief overview of the scheme before detailing the particular aspects relevant to Grasso's appeal.

## A

The scheme, as crafted by Mark Abrams, a mortgage broker, and Charles Elliott Fitzgerald, a real estate developer, took advantage of the real estate frenzy of the early 2000s. The conspirators would enter into a purchase agreement for a home in an exclusive Westside Los Angeles community, and then obtain a loan for significantly more than the sale price, pocketing the extra money. For this scheme to work, the conspirators had to exert control over multiple aspects of each real estate transaction. Among other things, the sellers

and agents had to keep the true purchase price of the home confidential; the appraisal reports had to show the falsely inflated values of the homes; the title and escrow companies had to prepare two sets of documents, one showing the actual purchase price (for the seller) and one showing the inflated purchase price (for the lender); and finally the Multiple Listing Service (MLS) had to show the falsely inflated sales price of the homes. Abrams and Fitzgerald coordinated the efforts of a range of colleagues to make this conspiracy work. Abrams relied on Jamieson Matykowski, one of his employees, and Richard Maize, who controlled Americorp Funding, among others. Americorp, a mortgage broker, would send loan packages to lending agents for review and approval. The conspirators generally targeted banks that did not require their lending agents to use rigorous documentation and approval standards. Over the course of the scheme, the conspirators conducted roughly 80 fraudulent transactions. The banks that ultimately financed the loans that their lending agents approved, including Lehman Brothers (through its lending agent, Aurora Loan Services), GreenPoint Bank (through its lending agent, GreenPoint Mortgage), and RBC Mortgage Company, together lost at least $46 million in the Abrams-Fitzgerald conspiracy.

Grasso was one of Abrams and Fitzgerald's recruits for this scheme. Grasso and his partner Joseph Babajian were successful real estate agents in the same affluent area that Abrams and Fitzgerald targeted, Westside Los Angeles. From 2000 to January 2001, Grasso and Babajian were the top-producing real estate agents at Fred Sands Realtors in Beverly Hills. Grasso and Babajian subsequently left Fred Sands and became affiliated with Prudential California Realty. Prudential compensated Grasso and Babajian for their move by conveying an ownership interest in several of

Prudential's subsidiaries to Grasso and Babajian's wholly owned company, FSC Ventures. One of these subsidiaries was Cal Title, a title insurance company whose lax approval process would become instrumental to the co-conspirators' operation.

At trial, the government presented evidence to prove that Grasso became involved in the Abrams-Fitzgerald scheme some time in 2000 and worked with them through at least late 2002. According to the government, Grasso participated primarily by identifying houses to be included in the scheme, ensuring that the seller would keep the sales price confidential, managing the information reported in the MLS listings, and obtaining the title insurance and escrow documents needed for the conspiracy through his access to Cal Title. The government's case against Grasso rested heavily on evidence relating to six real estate transactions, which we describe in the order they occurred.

**1**

We begin with Grasso's purchase of a property on Claridge Drive, Beverly Hills for his personal use. In July 2000, after Grasso separated from his wife, he was in the market for his own home, and focused on the Claridge Drive property. According to the evidence adduced at trial, Abrams thought that Grasso's skills and contacts were useful in furthering the scheme and wanted to "ingratiate" himself with Grasso to induce him to continue helping with the fraud. Therefore, Abrams offered to help Grasso purchase the Claridge Drive property by following the same basic blueprint used for other transactions in the scheme. Under the plan, Abrams would front Grasso the money for a down payment, Grasso would obtain an inflated loan, and then use

the extra funds to pay Abrams back.  According to Abrams, Grasso knew how the scheme worked and was a willing participant.  Matykowski confirmed that Grasso acknowledged he was "going to do one of our deals" by inflating the purchase price of the Claridge Drive property "to forego putting a large down payment down."

The plan moved forward over the summer.  Grasso entered into a purchase agreement with Jose Menendez, the owner of the Claridge Drive property, to purchase the house for $890,000.[1]  In early September 2000, Grasso submitted two fraudulent loan applications to Americorp Funding, one seeking a first mortgage of $746,250, and the second seeking a home equity credit line of $149,200.  Both applications stated that the purchase price of the home was $995,000, and the first application stated that Grasso was making a down payment of some $120,000.  Americorp submitted Grasso's application to GreenPoint Mortgage.  In reviewing the applications, GreenPoint Mortgage identified a red flag: Grasso already owned a home that had a higher value than the Claridge Drive property, which raised the inference that Grasso planned to use the Claridge Drive property as a rental. In response to GreenPoint Mortgage's inquiry on this point, Grasso falsely stated that he and his wife intended to move into the home.  Satisfied with that explanation, GreenPoint Mortgage approved Grasso's loans.  As was the standard procedure for all loans that GreenPoint Mortgage originated at that time, GreenPoint Bank funded the loan.

---

[1] One version of the purchase agreement showed an inflated $990,000 sales price, but Menendez testified at trial that his initials on this agreement were fabricated.

At closing, Abrams's in-house escrow company prepared fraudulent documents reflecting a purchase price of $995,000, but sent a settlement statement to Menendez stating the correct $890,000 sales price.

**2**

At the same time he was purchasing the Claridge Drive property, from August to September 2000, Grasso sought Abrams and Fitzgerald's help with a client's property on Alta Drive in Beverly Hills. The property had been on the market for nearly a year, and the seller, Vigen Shaghzo, was putting pressure on Grasso to sell it. Abrams and Fitzgerald agreed to buy the Alta Drive property if they could work one of their fraudulent deals.

The Alta Drive transaction unfolded as follows. In early August 2000, Abrams offered $2,000,000 to Shaghzo in the name of Abrams's father, a straw purchaser. According to Abrams, Grasso knew that Abrams's father was not actually purchasing the home. After Shaghzo accepted the $2,000,000 offer, Grasso withdrew the $2,050,000 MLS listing for the house and relisted it for $4,495,000. This false relisting caused a problem, however: when Shaghzo found out about it, he ordered Grasso to correct the misinformation, and Grasso agreed to do so. Abrams and Fitzgerald then submitted a fraudulent loan application for an inflated purchase price of $4,395,000 to Aurora Loan Services for approval. A loan for the full amount was funded by Lehman Brothers. After the sale closed in September 2000, and the escrow company disbursed the loan proceeds from Lehman Brothers, Abrams paid Grasso's firm $46,436 in commissions. Several months later, MLS reported the property sold at its true price of $2,000,000. To prevent

Aurora Loan Services and Lehman Brothers from seeing this accurate listing, Grasso again arranged to change the MLS listing to show a sales price of $4,495,000.

### 3

In January 2001, after Grasso became affiliated with Prudential and obtained an indirect interest in Cal Title, Abrams and Fitzgerald began using Cal Title to provide title insurance for their purchases. Cal Title was willing to prepare two title insurance policies, one with the inflated purchase price (which would be provided to the lender) and the second with the actual purchase price (that the seller could review). Although Abrams and Fitzgerald attempted to use other title companies for their transactions, these companies soon declined to work with them, and Abrams and Fitzgerald began using Cal Title exclusively, whether or not Grasso or Babajian was acting as the agent for the transaction.

Sometime in 2001, Grasso called Matykowski to complain that Abrams and Fitzgerald had been using Cal Title for transactions where he was not the agent. Grasso was agitated about this development, and forbade the Abrams-Fitzgerald team from using Cal Title unless Grasso and Babajian were in the deal. Abrams later told Matkyowski that he agreed to pay Grasso and Babajian—via Prudential—a commission on transactions where Cal Title was involved, even when they were not serving as agents.

### 4

From approximately February 2001 through summer 2002, Grasso represented Abrams and Fitzgerald in their acquisition of four additional properties relevant to this

appeal. For a property on Mandeville Canyon Road, Beverly Hills, Grasso submitted several unsuccessful purchase offers using the names of different straw buyers, before submitting a third, successful offer on behalf of "Jamieson Matykowski and/or assignee." While the transaction was in escrow, Matykowski purportedly assigned the purchase agreement to yet another straw buyer. As in the Alta Drive transaction, the straw buyer was not the true purchaser and in fact did not know the conspirators had used his name. In addition to multiple straw purchasers, the conspirators also used two different escrow companies: the original escrow company resigned after determining it was uncomfortable with the transaction, and was replaced by Cal Title. FSC Ventures (Grasso and Babajian's wholly owned company) earned $19,231 in commissions for the deal.

Grasso also assisted the conspirators in purchasing a property on Claircrest Drive in Beverly Hills. According to Matykowski, Grasso was aware that the conspirators were using a straw purchaser for this property, as well. At one point, Matykowski testified, he was in Grasso's office, and jokingly told Grasso, "Turn your back for a second I'm going to sign this contract." Matykowski then forged the name "Hugo Wendt" on the purchase offer. Grasso treated this forgery as "just normal." Once the seller accepted the offer for the Claircrest Drive property, Grasso asked the escrow officer to assign the purchase agreement to a different straw purchaser. Abrams and Fitzgerald paid FSC Ventures $21,490 in commissions for this transaction when it closed.

In summer 2002, Abrams and Fitzgerald purchased two more Beverly Hills properties, one on Yoakum Drive and the other on Benedict Canyon Drive. Although they did not use either Grasso or Babajian as their real estate agent, they did

use Cal Title. Consistent with Abrams's prior agreement, Abrams paid Prudential (which in turn paid Grasso and Babajian through FSC Ventures) a three percent commission for each transaction, which together amounted to $50,833. Abrams made these payments separately after the deals closed and the bank had already wire transferred the loan proceeds; the payments did not go through escrow or show up on the settlement statements for the transactions. Abrams and Grasso characterized these payments as "referral fees."

## B

In August 2007, a grand jury indicted Grasso for one count of conspiracy to commit bank fraud and loan fraud, in violation of 18 U.S.C. § 371.[2] This charge named Grasso and three co-defendants, including Rizk and Babajian, along with six other co-conspirators, including Abrams and Fitzgerald. Listing nine transactions as overt acts, the government alleged that the co-conspirators devised and executed a scheme to commit bank fraud against Lehman Brothers, GreenPoint Bank, and other federally-insured institutions between 2000 and 2003, and to commit loan fraud by submitting false statements, reports, and valuations in connection with the listed transactions.[3]

---

[2] 18 U.S.C. § 371, as relevant here, provides that "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy," each shall be subject to criminal penalties.

[3] These include the Claridge Drive, Alta Drive, Mandeville Canyon Road, Claircrest Drive, Yoakum Drive, and Benedict Canyon Drive

The indictment also charged Grasso with one count of bank fraud and aiding and abetting, in violation of 18 U.S.C. §§ 2,[4] 1344(1);[5] seventeen counts of loan fraud and aiding and abetting, in violation of 18 U.S.C. §§ 2, 1014;[6] and three counts of money laundering and aiding and abetting, in violation of 18 U.S.C. §§ 2, 1956(a)(1).[7] The bank fraud charge named all four defendants and rested on the same allegations as the conspiracy charge. The money laundering

---

transactions, as discussed in detail above, as well as three additional transactions involving properties at Anacapa View Drive in Malibu, Stradella Road in Los Angeles, and Roscomare Road, also in Los Angeles.

[4] 18 U.S.C. § 2 provides that "(a) [w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces, or procures its commission, is punishable as a principal [, and] (b) [w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

[5] 18 U.S.C. § 1344(1), as relevant here, provides criminal penalties for "knowingly execut[ing], or attempt[ing] to execute, a scheme or artifice – (1) to defraud a financial institution."

[6] 18 U.S.C. § 1014, as relevant here, provides criminal penalties for "knowingly mak[ing] any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation."

[7] 18 U.S.C. § 1956(a)(1), as relevant here, provides criminal penalties for "[w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity – . . . (A)(i) with the intent to promote the carrying on of specified unlawful activity . . . [or] (B) knowing that the transaction is designed in whole or part – (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

and loan fraud charges related to specific real estate transactions.[8] The three money laundering charges related to individual "referral" payments that Abrams made to Prudential after the Yoakum Drive and Benedict Canyon Drive transactions.

After a jury trial, Grasso was convicted on all conspiracy, bank fraud, and money laundering charges, and on the loan fraud charges relating to the Claridge Drive, Alta Drive, Mandeville Canyon Road, and Claircrest Drive transactions. Grasso moved for acquittal on all charges or in the alternative for a new trial. The district court denied these motions, rejecting his sufficiency of the evidence claims. The court sentenced Grasso to twelve months and one day in prison and $13 million in restitution.

## II

On appeal, Grasso argues that the district court erred in denying his motion for acquittal, *see* Fed. R. Crim. P. 29, because the evidence was insufficient to support a guilty verdict on the conspiracy, bank fraud, loan fraud, and money laundering counts for which he was convicted.[9]

---

[8] The loan fraud charges arose from five separate transactions: Claridge Drive, Alta Drive, Mandeville Canyon Road, and Claircrest Drive, as discussed above, as well as a fifth property that Abrams and Fitzgerald purchased on Roscomare Road in Los Angeles. Grasso was acquitted on the loan fraud counts relating to the Roscomare Road transaction, which are therefore not part of this appeal.

[9] Grasso also argues that the district court violated his Sixth Amendment right to confrontation by admitting a statement from Tim Holland, a co-conspirator who controlled one of Abrams's in-house escrow companies. Although the Sixth Amendment limits the admissibility of testimonial

We have jurisdiction under 28 U.S.C. § 1291. We review denials of Rule 29 motions for acquittal de novo. *United States v. Gonzalez-Diaz*, 630 F.3d 1239, 1242 (9th Cir. 2011). In considering a claim that the evidence adduced at trial was insufficient to sustain a conviction, "[a] reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This means that "a reviewing court 'must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Id.* (quoting *Jackson*, 443 U.S. at 326). Second, the court must determine whether the evidence, viewed in that manner, "is adequate to allow any rational trier of fact to find the essential elements of a crime beyond a reasonable doubt." *Id.* (internal quotation marks and alterations omitted).

## A

We begin with Grasso's appeal of his conviction for conspiracy to commit loan fraud and bank fraud. To convict Grasso of conspiracy, the government must first prove that a conspiracy existed. "To prove a conspiracy under 18 U.S.C. § 371, the government must first establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *Rizk*, 660 F.3d at 1134

evidence, *see Crawford v. Washington*, 541 U.S. 36 (2004), co-conspirator statements in furtherance of a conspiracy are not testimonial, *United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005), and therefore we reject this argument.

(quoting *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008)). "Once the existence of the conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy." *United States v. Meyers*, 847 F.2d 1408, 1413 (9th Cir. 1988). We have explained that a defendant may have a "slight connection" to a conspiracy even if the defendant did not know all the conspirators, did not participate in the conspiracy from its beginning or participate in all its enterprises, or otherwise know all its details. *See United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009). However, "[i]t is not a crime to be acquainted with criminals or to be physically present when they are committing crimes." *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001).

Where the defendant has a connection (even if slight) to the conspiracy, the government must also show that the defendant's connection to the conspiracy is knowledgeable; "that is, the government must prove beyond a reasonable doubt that the defendant knew of his connection to the charged conspiracy." *Meyers*, 847 F.2d at 1413. To establish a knowing connection, "[t]here need not, of course, be proof that the conspirators were aware of the criminality of their objective," *Ingram v. United States*, 360 U.S. 672, 678 (1959). Instead, the government must show that the defendant was aware of "the unlawful object toward which the agreement [was] directed," *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987); *see also id.* ("[k]nowledge of the objective of the conspiracy is an essential element of any conspiracy conviction.") (citing *Ingram*, 360 U.S. at 678). The government may rely on circumstantial evidence and inferences drawn from that evidence in order to prove the

defendant's knowing connection to the conspiracy. *See United States v. Johnson*, 297 F.3d 845, 868–69 (9th Cir. 2002).

Here, it is undisputed that the government sufficiently proved the existence of a conspiracy to commit bank fraud and loan fraud. As we explained in *Rizk*, "Abrams, Fitzgerald, and others associated with them initiated and carried out a scheme to defraud mortgage lenders." *Rizk*, 660 F.3d at 1128. Nor does Grasso contest that he participated in the conspiracy; rather, the disputed issue is whether he did so knowingly.

To that end, Grasso argues that the government failed to adduce sufficient evidence to prove he had "knowledge of the objective of the conspiracy," *id.* at 1134. According to Grasso, Abrams and Fitzgerald targeted and manipulated him because of his "highly respected and extremely successful" real estate practice in Los Angeles. Grasso claims that the evidence showed that his involvement in the conspiracy was limited to the legitimate aspects of the real estate transactions, and he was unaware of the fraudulent steps in Abrams and Fitzgerald's scheme.

Viewing the facts in the light most favorable to the prosecution, *Nevils*, 598 F.3d at 1164, we conclude that the government presented more than sufficient evidence that Grasso knew the objectives of the fraudulent scheme. A rational jury could determine beyond a reasonable doubt that as early as July 2000, Grasso knew that the real estate transactions were structured to deceive Lehman Brothers, GreenPoint Bank, and other federally insured banks, and that he assisted in this deception. The evidence showed that Grasso assisted his co-conspirators in convincing lenders that

various properties were sold for more than their actual sales prices. Grasso personally benefitted from falsely inflating the purchase price for his Claridge Drive property, and he personally inflated the MLS listing in the Alta Drive transaction. He was aware of the role Cal Title played in creating two different title insurance policies, one showing the inflated purchase price and one showing the true purchase price. Matykowski's testimony that he joked with Grasso about forging the signature of a straw purchaser, along with other evidence, indicated that Grasso knew that the conspirators furthered the scheme by using the names of straw purchasers who might not even be aware of the transaction. Finally, the evidence showed that Grasso was an expert in his field, so the jury could reasonably conclude that he was not duped by Abrams and Matykowski into innocently carrying out the acts described above.

We reached a similar conclusion in *Rizk*. Like Grasso, Rizk argued that the evidence was insufficient to establish that she knew of the objective of the conspiracy. *Rizk*, 660 F.3d at 1134. We disagreed, holding that a rational jury could have found beyond a reasonable doubt that Rizk intended to defraud the victim lenders in light of evidence that Rizk significantly overvalued the properties in preparing her appraisals, requested that the MLS database be manipulated to show higher sales prices, and knew her appraisals were being used to get loans on the properties. *Id.* at 1134–35. Like Grasso, Rizk also raised the defense that she was "duped and used" by Abrams and Fitzgerald, but we held that the government had introduced sufficient evidence to overcome this defense by showing that Rizk was an "experienced appraiser," "knew that her appraisals were being used to finance the purchase of properties," and "was unduly influenced by the values put forth by Abrams and

Fitzgerald." *Rizk*, 660 F.3d at 1135. Here, too, the government's evidence, taken in the light most favorable to the prosecution, *see Nevils*, 598 F.3d at 1164, was sufficient for the jury to reject Grasso's exculpatory theory and to find beyond a reasonable doubt that he had "knowledge of the objective of the conspiracy." *Rizk*, 660 F.3d at 1135.

## B

Next, we consider Grasso's appeal of his convictions for loan fraud associated with the Claridge Drive, Alta Drive, Mandeville Canyon Road, and Claircrest Drive transactions. To obtain a loan fraud conviction, the government must prove that the defendant "[1] knowingly [made] any false statement or report . . . for the purpose of influencing in any way [2] the action of . . . a bank insured by the Federal Deposit Insurance Corporation." 18 U.S.C. § 1014.

## 1

Grasso begins by challenging his loan fraud conviction for the Claridge Drive transaction. Grasso claims that the government did not prove that he had sufficient knowledge that the false statements he made to obtain loans to buy the Claridge Drive property would influence a federally insured bank, and so failed to prove that he made his false statements for that purpose.

We disagree with this argument. Contrary to Grasso's claims, the government can prove the knowledge element of § 1014 by showing that Grasso made false statements for the purpose of obtaining a loan, knowing that those statements

would be submitted to federally insured banks.[10]  *See United States v. Bellucci*, 995 F.2d 157, 159 (9th Cir. 1993) (per curiam) ("Section 1014's proscription of knowing misrepresentation reach[es] a defendant's knowledge of the statement's presentation to banks generally[,] as distinguished from a particular bank.") (internal quotations omitted) (quoting *United States v. Lentz*, 524 F.3d 69, 71 (5th Cir. 1975)).    In *Bellucci*, the defendant submitted a loan application with false statements through his mortgage broker, who eventually conveyed them to a bank.  995 F.3d at 159.  Because Bellucci had a long career as a developer and builder and thus "was familiar with the manner in which the lending process operates," and even testified that he understood his broker "would use the loan applications to go shop for loans," the court concluded that "a rational jury could easily infer beyond a reasonable doubt that Bellucci knew [that his broker] would present his loan application to a variety of financial institutions, including banks." *Id.*  Here, evidence at trial showed that Grasso was an experienced real estate agent who, like Bellucci, was well-versed in the mortgage lending process.  For instance, Grasso and his partner Babajian, as a team, were the top-grossing real estate agents at Prudential in California in 2002.  The evidence also showed Grasso's understanding that the Claridge Drive deal would operate on the scheme's basic blueprint, which was generally to obtain funding from banks that did not impose rigorous standards on their lending agents.  Taking this evidence together, a jury could reasonably conclude that Grasso knew that his false statements made to obtain a loan

---

[10] Congress amended § 1014 in 2009 to cover "mortgage lending businesses," but this expanded definition applies only prospectively and therefore does not cover the events in this case.  Fraud Enforcement and Recovery Act of 2009 (FERA), Pub.L. No. 111–21, §§ 2(c)(2), 4(f).

would ultimately influence an insured bank. *See Bellucci*, 995 F.3d at 159.[11]

**2**

Grasso next argues that there was insufficient evidence to convict him of loan fraud because he was involved only in the legitimate first step of the real estate transactions, had no knowledge of the scheme to defraud banks, and did not make any false statements to a federally insured financial institution in the Alta Drive, Claircrest Drive, and Mandeville Drive transactions.[12]

This argument also fails. Under *Pinkerton v. United States*, a defendant charged with participating in a conspiracy may be subject to liability for offenses committed as part of that conspiracy, even if the defendant did not directly participate in each offense. 328 U.S. 640, 647 (1946); *see also United States v. Hernandez-Orellana*, 539 F.3d 994, 1007 (9th Cir. 2008). *Pinkerton* "renders all co-conspirators criminally liable for reasonably foreseeable overt acts

---

[11] Grasso also argues that the government failed to demonstrate a nexus between GreenPoint Mortgage and GreenPoint Bank that was sufficient to satisfy § 1014's federal jurisdictional element for the Claridge Drive transaction. Because we have already concluded that Grasso knew his false statements would ultimately influence a bank under *Bellucci*, we reject this argument. *Bellucci*, 995 F.3d 159; *cf. United States v. McDow*, 27 F.3d 132, 136 (5th Cir. 1994).

[12] Although Grasso addresses this argument to all four of his loan fraud convictions (for the Claridge Drive, Alta Drive, Mandeville Canyon Road, and Claircrest Drive transactions), it is inapplicable to Grasso's Claridge Drive loan fraud conviction, because Grasso personally made false statements in his loan application and related documents for Claridge Drive. We affirm that count for the reasons discussed above.

committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not." *Hernandez-Orellana*, 539 F.3d at 1007. Although we have noted there may be due process limitations to imposing *Pinkerton* liability on defendants "with extremely minor roles in the conspiracy," *United States v. Bingham*, 653 F.3d 983, 997 (9th Cir. 2011), or where "the relationship between the defendant and the substantive offense is slight," *United States v. Castaneda*, 9 F.3d 761, 766 (9th Cir. 2003), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000), such concerns are not present in this case.

Taking the evidence adduced at trial in the light most favorable to the government, a reasonable juror could find all the necessary elements to impose *Pinkerton* liability, contrary to Grasso's contention that he had nothing to do with the fraud. Abrams and Matykowski testified that Grasso was well aware of the conspiracy's fraudulent purpose and had a substantial role in it by the time the Alta Drive, Mandeville Canyon Road, and Claircrest Drive transactions occurred. Moreover, Abrams admitted that he committed loan fraud in each of these transactions, which took place according to the scheme's basic blueprint. Because Grasso was aware of this blueprint, he could reasonably have foreseen Abrams's loan fraud in those transactions. Thus, there is no due process problem in holding him liable for Abrams's acts under *Pinkerton*. Because there is sufficient evidence to uphold Grasso's convictions for loan fraud under *Pinkerton*, it does not matter whether Grasso was aware of when or whether Abrams committed the acts constituting loan fraud in each transaction. *Hernandez-Orellana*, 539 F.3d at 1007.

## C

We now turn to Grasso's appeal of his conviction for bank fraud, based on his role in the scheme to defraud Lehman Brothers and GreenPoint Bank. The bank fraud statute, 18 U.S.C. § 1344(1), provides criminal penalties for anyone who "knowingly executes, or attempts to execute, a scheme or artifice − . . . (1) to defraud a financial institution."[13] Grasso argues that the government failed to adduce sufficient evidence that he had knowledge of the object of the scheme to defraud banks or that he had the requisite intent to defraud. *See Rizk*, 660 F.3d at 1135 (stating that one of the "essential elements" of bank fraud under § 1344(1) is that the defendant executed or attempted to execute the fraudulent scheme "with the intent to defraud").

In making its case that Grasso was guilty of bank fraud, the government relied on the same evidence of Grasso's knowledge that supported his conviction for conspiracy to commit bank fraud. Accordingly, Grasso's argument that the evidence was insufficient fails for the same reason that his challenge to his conspiracy conviction fails: viewing the facts in the light most favorable to the prosecution, there was ample evidence that Grasso was well aware of the scheme's

---

[13] In 2009, Congress amended 18 U.S.C. § 20(1), which supplies the definition of "financial institution" for § 1344, to cover "mortgage lending businesses" such as GreenPoint Mortgage and Aurora. *See United States v. Bennett*, 621 F.3d 1131, 1138 (9th Cir. 2010). This amendment applies prospectively, however, and with respect to the events in this case, the only definition of "financial institution" in § 20(1) relevant here was "insured financial institution." FERA §§ 2(a)(3), 4(f).

fraudulent objective and that he intentionally furthered the fraud. *See supra* at 16–18.[14]

## D

Finally, we address Grasso's argument that the government presented insufficient evidence to convict him of money laundering when he received two "referral fees" for the Yoakum Drive and Benedict Canyon Drive transactions. Grasso argues that Abrams gave him referral fees for access to Cal Title, that the loan fraud and bank fraud scheme could not have occurred without such access, and, therefore, that the money laundering offense merged into the underlying loan fraud and bank fraud offenses and cannot be separately punished.

## 1

To address this argument, we first consider the relevant legal framework. Under the money laundering statute, 18 U.S.C. § 1956(a)(1), the government must prove that a defendant: [1] knew that money being used in a financial transaction was the "*proceeds* of some form of unlawful activity," and [2] then conducted or attempted to conduct a financial transaction with such proceeds; [3] for the purpose

---

[14] As he argued with respect to his loan fraud convictions, Grasso also contends here that there was an insufficiently close connection between GreenPoint Mortgage and GreenPoint Bank to satisfy § 1344's federal jurisdictional element. Because we have already concluded that the government adduced sufficient evidence to establish that Grasso knew that the scheme was aimed at federally insured banks, we again reject this argument. *Cf. United States v. Edelkind*, 467 F.3d 791, 797–98 (1st Cir. 2006).

of either promoting an unlawful activity or for concealment. *See* 18 U.S.C. § 1956(a)(1) (emphasis added).

In *United States v. Santos*, the Supreme Court attempted to define the term "proceeds" but could not reach a five-justice majority to do so. 553 U.S. 507 (2008). In *Santos*, the defendant was convicted of running an illegal lottery, in which "runners" took bets from gamblers and delivered the money to "collectors." 553 U.S. at 509. Those collectors, in turn, passed the money along to defendant Santos, who then paid the runners and collectors for their services and disbursed awards to the lottery winners. *Id.* The government charged Santos with money laundering under § 1956(a) on the theory that the money used to pay the runners, collectors, and lottery winners was the proceeds of his illegal lottery and that Santos was using that money to promote the carrying on of the lottery activity. *Id.* at 509–10.

On appeal, the Court considered whether the word "proceeds" in § 1956 meant the gross receipts of an illegal activity, or only the net receipts, i.e., the profits of that activity. Writing for a four-justice plurality, Justice Scalia concluded that both definitions of "proceeds" were plausible, and that "because the 'profits' definition of proceeds is always more defendant-friendly than the 'receipts' definition, the rule of lenity dictates that it should be adopted." *Id.* at 513. In supporting this conclusion, the plurality noted that defining "proceeds" to mean "receipts" would frequently lead to a "merger problem": "nearly every violation of the illegal-lottery statute would also be a violation of the money laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Id.* at 515. The plurality noted that Congress would not have "wanted a

transaction that is a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code to radically increase the sentence for that crime" by application of the money-laundering statute. *Id.* at 517. Because Santos's payments to the runners, collectors and lottery winners were a normal part of the cost of doing business (and not pure profit), the plurality concluded the payments did not constitute "proceeds" for purposes of the statute. *Id.*

Four justices rejected this analysis and dissented. The dissent contended that "proceeds" should be defined as "gross receipts," and would leave any "merger problems" to district judges' discretion at sentencing. *Id.* at 547 (Alito, J., dissenting). Under this analysis, Santos's payments to the runners, collectors and lottery winners were made out of the gross receipts of the lottery business and thus constituted "proceeds" for purposes of the statute.

Justice Stevens, in a concurrence, rejected both definitions of "proceeds," and adopted a case-by-case approach. He was particularly troubled by the fact that the dissenting opinion allowed "the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense." *Id.* at 527 (Stevens, J., concurring). Considering both "common sense" and the "rule of lenity," Justice Stevens agreed with Justice Scalia that there was no reason to think Congress intended that "revenue generated by a gambling business that is used to pay the essential expenses of operating that business," which is "a normal part of a crime it had duly considered and appropriately punished elsewhere in the Criminal Code," should also be punished as money laundering. *Id.* at 528. Justice Stevens explained that this result was "particularly

unfair in [*Santos*] because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business." *Id.* at 527. Congress had capped the maximum sentence for engaging in an illegal lottery to five years, an "important limitation" that would be "eviscerated" if a court could impose a sentence of up to twenty years, the statutory maximum for money laundering. *Id.* Justice Stevens concluded that Congress could not have intended such a "perverse result." *Id.* at 528.

Although Justice Stevens agreed that proceeds meant "profits" in the lottery scheme, he agreed with the four justices in dissent that proceeds did not mean profits in every case. Among other things, he explained, "the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 526–27.

*Santos* quickly caught the attention of Congress, which amended § 1956 in 2009 to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." FERA § 2(f). The amendments effectively endorsed Justice Alito's dissent and overruled any interpretation of "proceeds" based on Justice Scalia's and Justice Stevens' opinions. *See* S. Rep. 111-10, at 432 (2009) (explaining that the plurality decision in *Santos* was "erroneous" and "contrary to Congressional intent."). Under the current version of § 1956, there could be no debate that Grasso's "referral fees" for the Yoakum Drive and Benedict Canyon Road transactions would be separately punishable as money laundering. The 2009 amendments are

not retroactive, however, *see* FERA § 4(f), and so we must apply *Santos* in assessing Grasso's merger argument.

In analyzing the three opinions produced by the *Santos* court, we have derived the controlling rule that "'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*." *See United States v. Van Alstyne*, 584 F.3d 803, 814 (2009). Our subsequent case law has identified three factors we consider in determining when such a "merger problem" arises.

First, we look to whether a given transaction was a "central component" of the underlying scheme. *Van Alstyne*, 584 F.3d at 815. In *Van Alstyne*, a defendant was charged with 19 counts of mail fraud for running a Ponzi scheme and three money laundering convictions. *Id.* at 809. In considering the defendant's challenge to the money laundering convictions, we struck down the two based on regular distributions to individual investors in the Ponzi scheme. Because "issuing distribution checks that supposedly represented generous returns on his victims' investment was a central component of the 'scheme to defraud,'" we held that convicting the defendant of money laundering "for the bank transfers inherent in the 'scheme' central to the mail fraud charges" would raise a merger problem. *Id.* at 815. On the other hand, we held that the money laundering conviction based on the refund of an investor's entire investment after the scheme began to unravel did not raise such a merger problem. *Id.* We reasoned that the refund check was not part of the "core scheme" because the payment "undermined rather than advanced" the Ponzi scheme. *Id.* at 815–16; *see also United States v. Bush*, 626 F.3d 527, 538 (9th Cir. 2010) (reasoning that transfers of

proceeds from a four-year, $36 million Ponzi scheme were not central to "carrying out the scheme's objective[s]" in part because the defendant had "operated his scheme for several years" before transferring funds to his account, and concluding that the transfers did not raise a merger problem); *United States v. Phillips*, 704 F.3d 754, 766 n.11 (9th Cir. 2012) (looking to whether the money laundering transaction was a "central component" of the underlying scheme); *United States v. Moreland*, 622 F.3d 1147, 1166 (9th Cir. 2010) (same).

Second, we consider whether the inclusion of the money laundering charges leads to "'a radical increase in the statutory maximum sentence' for the underlying offense," because five justices in *Santos* also expressed this concern. *Bush*, 626 F.3d at 538 (quoting *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009)).[15]  In other words, when Congress caps a defendant's maximum sentence for the underlying offense at something radically less than the maximum sentence for money laundering, we may infer that Congress did not intend the "important limitation" on the penalty for the underlying offense to be "eviscerated" by the penalty for a money laundering conviction. *Santos*, 553 U.S. at 527.  By contrast, where a defendant's underlying mail and wire-fraud convictions carried a statutory maximum sentence of thirty years, Congress's choice of penalty would not be "eviscerated" by the ten-year statutory maximum sentence for money laundering.  *See Bush*, 626 F.3d at 538; *see also*

---

[15] Although the dissent questions our reliance on *Bush* and *Phillips* because they followed the Sixth Circuit's approach, *see* dis. op. at 45–46, we see no irreconcilable conflict between these cases and *Van Alstyne*, which did not consider this issue in conducting its merger analysis. Therefore, we are bound by our precedent.

*Phillips*, 704 F.3d at 766 n.11 (9th Cir. 2012) (holding that *Santos*'s concern regarding the evisceration of Congress's choice of a low statutory maximum penalty for an underlying offense did not apply where the underlying offenses carried maximum sentences of twenty years, and the money laundering offense carried a lower maximum sentence of ten years).

Third, we generally consider the money used in co-conspirator transfers in crimes such as the sale of contraband, fraud, or bribery as constituting the "proceeds" of such crimes for purposes of the money laundering statute. In *United States v. Webster*, we concluded that when "a money laundering count is based on transfers among co-conspirators of money from the sale of drugs, 'proceeds' includes all 'receipts' from such sales." 623 F.3d 901, 906 (9th Cir. 2010). We acknowledged that Justice Scalia's plurality opinion stated that the merger problem might exist for certain payments among conspirators, but concluded that this was a minority view that was not controlling. *Id.* Rather, we relied on the four justices in dissent, plus Justice Stevens, who agreed that "the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.*

In *United States v. Wilkes*, we extended *Webster*'s rationale beyond drug cases and into the context of fraud and bribery. 662 F.3d 524 (9th Cir. 2011). In *Wilkes*, the ringleader of a scheme involving kickbacks to a Congressman in exchange for lucrative government contracts challenged his

conviction of concealment money laundering.[16]     The
defendant challenged his conviction on two grounds.  He first
argued that his use of multiple transfers to indirectly pay off
the Congressman did not constitute "concealment," *id.* at
545–47.  Second, relying on *Santos*, Wilkes argued that his
transfer of funds to pay off the Congressman "was merely an
expense associated with the bribery, and, thus, not
'proceeds'" under the money laundering statute.  *Id.* at
548–49. We rejected both arguments.  We first held that the
government had proven concealment because "the effort to
disguise the source of the money was an additional act that is
separately punishable."     *Id.* at 547.     With respect to
defendant's *Santos* argument that there was insufficient
evidence that the bribes constituted "proceeds," we concluded
that "[u]nder *Webster*, [the defendant's] money laundering
count was based on a transfer to a co-conspirator of money
from honest services fraud and bribery such that 'proceeds'
would include all 'receipts' from the fraud."  *Id.* at 549.
Accordingly, we rejected defendant's argument that because
the kickback payments were an inherent part of the scheme to
defraud, they could not constitute proceeds for purposes of
the money laundering statute, and concluded that defendant's
transfers to the Congressman "constituted 'proceeds' of the
scheme to defraud," *id.*

---

[16] To establish the sort of concealment money laundering involved in
*Wilkes*, the government was required to prove that the defendant:  [1]
knew that money being used in a financial transaction was the "*proceeds*
of some form of unlawful activity," and [2] then conducted a financial
transaction with such proceeds; [3] "to conceal or disguise the nature, the
location, the source, the ownership, or the control of the proceeds."
18 U.S.C. § 1956(a)(B)(i) (emphasis added).  Because both promotional
and concealment money laundering require the government to prove that
the defendant knowingly used the "proceeds" of an unlawful activity,
*Wilkes*'s analysis of *Santos* is applicable here.  *Cf.* Dis. op. at 44.

We disagree with the dissent's argument that *Wilkes*'s determination that kickback payments to the Congressman were "proceeds" is inconsistent with *Van Alstyne*. Dis. op. at 45. *Van Alstyne* did not have occasion to address co-conspirator transfers, while *Webster* and *Wilkes* appropriately relied on five justices' views in *Santos* in concluding that such transfers did not raise a merger problem. *Van Alstyne*'s statement that a merger problem may be triggered when confederates in a scheme shared profits was based on a summary of Justice Scalia's plurality opinion, 584 F.3d at 815, and does not necessarily extend beyond the situation identified by Justice Stevens, that of illegal gambling operations. Accordingly, we are bound by our precedent in *Webster* and *Wilkes*.[17]

---

[17] The dissent's reliance on the Fourth Circuit's opinion in *United States v. Cloud*, 680 F.3d 396, 407 (4th Cir. 2012) is also misplaced. In defining and applying "essential expenses," *Cloud* relies on the *Santos* plurality's reasoning that the term "proceeds" excludes any payout to a co-conspirator. *Id.* at 403–09. We have not interpreted *Santos* so broadly, relying instead on Justice Stevens's case-by-case approach. *See, e.g.*, *Wilkes*, 662 F.3d at 549. Other circuits have likewise refused to interpret *Santos* as broadly as the Fourth Circuit. *See Kratt*, 579 F.3d at 562 (holding that "proceeds" means "profits" only when imposing a money laundering count "leads to a radical increase in the statutory maximum sentence, and only when nothing in the legislative history suggests that Congress intended such an increase"); *Garland v. Roy*, 615 F.3d 391, 402 (5th Cir. 2010) (applying the presumption that "proceeds" means "gross receipts" unless there is adequate legislative history to rebut the presumption); *United States v. Fishman*, 645 F.3d 1175, 1193–94 (10th Cir. 2011) (holding, in light of the fractured nature of *Santos*, that the opinion is confined to its factual setting so that "proceeds" means "profits" only where an illegal gambling operation is involved); *United States v. Demarest*, 570 F.3d 1232, 1242 (11th Cir. 2009) (same).

**2**

We now apply these principles to Grasso's argument that the government's money laundering charges for the Yoakum Drive and Benedict Canyon Road transactions raise a merger problem. Under the applicable case law, Grasso's argument turns on whether the government has provided sufficient evidence that the referral fees are "proceeds" of loan fraud and bank fraud. We first consider whether viewing "proceeds" as "receipts" in this context would raise a merger problem "of the kind that troubled the plurality and concurrence in *Santos*." *Van Alstyne*, 584 F.3d at 814.

On their face, the loan fraud counts do not raise such a merger problem. The loan fraud statute, § 1014, criminalizes knowingly "mak[ing] any false statement or report" to defraud an insured institution, while § 1956 criminalizes knowingly "conduct[ing] a financial transaction" involving proceeds of an unlawful activity for specified purposes. Because these statutes criminalize different types of behavior, the money laundering counts did not increase Grasso's sentence for the same behavior underlying the loan fraud counts.

Unlike the loan fraud counts, the bank fraud count charged Grasso with the entire Abrams-Fitzgerald "scheme to defraud," and so encompasses the Yoakum Drive and Benedict Canyon Drive transactions. But we reject Grasso's merger argument here as well. First, Abrams's two kickbacks to Grasso were not a "central component" of the underlying scheme. *Van Alstyne*, 584 F.3d at 815. Given that the Abrams and Fitzgerald scheme lasted three years and involved roughly 80 fraudulent transactions, and that Abrams and Fitzgerald generally secured access to Cal Title through

Grasso's participation in their real estate transactions, the two isolated referral payments to Grasso at the end of the scheme were not "central" to the scheme's success. *See Bush*, 626 F.3d at 537. The fact that the scheme operated successfully for several years before Abrams and Fitzgerald ever gave Grasso a kickback is powerful evidence of the kickbacks' "irrelevance to the overarching fraud scheme." *Id.* Moreover, Abrams's kickbacks to Grasso drained off funds that Abrams could have re-invested in purchasing another property to extract fraudulent loan proceeds, thus hindering the scheme in the same way the returned investment in *Van Alstyne* hindered the defendant's Ponzi scheme. *Van Alstyne*, 584 F.3d at 815–16.

Second, the inclusion of the money laundering charges did not threaten "'a radical increase in the statutory maximum sentence' for the underlying offense." *Bush*, 626 F.3d at 538 (quoting *Kratt*, 579 F.3d at 562). Here, the underlying bank fraud count has a 30-year statutory maximum, while the money laundering count has a 20-year statutory maximum. As in *Bush* and *Phillips*, the statutory cap on the penalty for bank fraud is not "eviscerated" by the maximum penalty for money laundering, and thus raises no inference regarding Congressional intent.[18] Finally, we have declined to define

---

[18] As noted above, the *Santos* plurality and Justice Stevens focused on how a money laundering charge could affect the statutory maximum chosen by Congress for the underlying offense. This question of Congressional intent is distinct from a district court's exercise of discretion in fashioning an appropriate sentence, which is inherently limited by the Sentencing Guidelines and the parsimony principle of 18 U.S.C. § 3553(a). Here, for instance, Grasso's guidelines range was 97 to 121 months, but he received just twelve months and one day of imprisonment for his crimes. *See Phillips*, 704 F.3d at 766 n.11; *see also Bush*, 626 F.3d at 538.

"proceeds" to mean "profits" when a money laundering conviction is based on kickbacks and transfers to co-conspirators in schemes to defraud such as Abrams's. *See Wilkes*, 662 F.3d at 547.

Because the money laundering convictions in this case do not raise a merger problem with respect to either the loan fraud or bank fraud convictions, we define "proceeds" to mean "gross receipts," and conclude that these referral fees may be viewed as "proceeds" of the loan and bank fraud. On that basis, we reject Grasso's argument that the government presented insufficient evidence that his money laundering charges were based on "separate and distinct" activity from the Yoakum Drive and Benedict Canyon Drive transactions.

It is undisputed that the remaining elements of promotion money laundering, under § 1956(a)(1)(A)(i), were fulfilled here. The government adduced evidence that Grasso knew that the referral fees were derived from the Benedict Canyon and Yoakum Drive transactions, and that Grasso knew these activities involved bank and loan fraud. Further, the testimony of Abrams and Matykowski sufficiently demonstrates that Grasso had the requisite intent to promote the carrying on of loan fraud, as his demands for money were intended to ensure the conspirators' ongoing access to Cal Title. We therefore affirm Grasso's money laundering conviction under § 1956(a)(1)(A)(i), and need not consider whether it could be alternatively upheld under § 1956(a)(1)(B)(i).

## III

We conclude that there was sufficient evidence to support Grasso's convictions for conspiracy, loan fraud, bank fraud,

and money laundering, and that the district court therefore did not err in denying Grasso's motion for acquittal.

**AFFIRMED.**

---

BERZON, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II.A–C of the panel's opinion but write separately with regard to Part II.A and respectfully dissent from Part II.D.

## I.

The *Reed* case relied on in Part II.A of the panel's opinion says the following: "Once a conspiracy is established, only a slight connection to the conspiracy is necessary to support a conviction. The term 'slight connection' means that a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details. A connection to the conspiracy may be inferred from circumstantial evidence. Innocent association, even if it is knowing, does not amount to a 'slight connection.'" *United States v. Reed*, 575 F.3d 900, 924 (9th Cir. 2009) (internal citations, quotation marks, and alterations omitted); *see* Maj. Op. at 15–16. The majority relies on *Reed*, and, although it slightly paraphrases the language of the opinion, I understand the majority opinion to incorporate *Reed*'s holding concerning the limited import of the "slight connection" locution. I therefore concur in Part II.A of the opinion.

I nonetheless write separately, to express my concern that some of the quotations in Part II.A could be read, in isolation, to suggest that a defendant may be convicted without in any way participating in a conspiracy, if he simply has knowledge of the conspiracy and a "connection" to its participants. *See* Maj. Op. at 15–16. That, of course, is not the law. *See, e.g.*, *United States v. Tran*, 568 F.3d 1156, 1164–65 (9th Cir. 2009) (reversing a conspiracy conviction because there was no "evidence . . . from which it could be inferred — much less proved beyond a reasonable doubt — that [the defendant] *participated* in the conspiracy in any manner") (emphasis added).

More than thirty-five years ago, a panel of this court endeavored to provide greater clarity regarding one aspect of the law of conspiracy, and in so doing, emphasized the risk of "proliferat[ing]" "statement[s]" of law that are "highly misleading if taken out of the context of the particular cases in which . . . made." *See United States v. Dunn*, 564 F.2d 348, 356 (9th Cir. 1977).[1] In the process, the court stated that "evidence establishing beyond a reasonable doubt a *connection* of a defendant with [a] conspiracy, even though the connection is slight, is sufficient to convict him with knowing participation in the conspiracy." *Id.* at 357 (emphasis added). At the same time, the panel noted that "after much reflection, [it was] of the mind that" that

---

[1] In *Dunn*, the government argued that "'[o]nce the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it,' quoting from *United States v. Knight*, 416 F.2d 1181, 1184 (9th Cir. 1969)." *Id.* at 356 (some internal quotation marks omitted). We observed that the quoted statement from *Knight* "obviously was [not] intended to state . . . the law regarding evidence," *id.*, and clarified that the evidence must be "establish[ed] beyond a reasonable doubt," *id.* at 357.

statement of law "may be of doubtful appellate application when the issue for review concerns whether the defendant was connected with the conspiracy at all." *Id.* at 357 n.21. The court quoted with approval a decision of the Fifth Circuit, explaining that this rule "'finds its proper application where persons are clearly connected to the conspiring group or are found acting in such a manner as unmistakably to forward its purposes.'" *Id.* at 357 n.21 (quoting *United States v. Alvarez*, 548 F.2d 542, 544 (5th Cir. 1977)).

Despite the doubts expressed by the *Dunn* court, in the intervening years, we have "repeatedly proliferated . . . th[e] statement" that a defendant may be convicted of "knowing participation in [a] conspiracy" based on evidence of a "slight" "connection" with the conspiracy. *See id.* at 356–57. As other judges have noted, this is a misleading, or at least ambiguous, standard. It could be read to "mean that once A and B conspire, . . . [a] 'slight connection' is enough to convict C of the same crime, an intolerable proposition." *See United States v. de Ortiz*, 883 F.2d 515, 524 (7th Cir. 1989) (Easterbrook, J., concurring), *reh'g granted and judgment vacated on other grounds*, 897 F.2d 220 (7th Cir. 1990). It also could be read to "mean that an appellate court must keep in mind the possibility that evidence may be slight quantitatively although substantial qualitatively — that a single piece of evidence may be enough in context, an unexceptionable proposition." *Id.* On the other hand, "[m]ere casual association with conspiring people is not enough," *see United States v. Bautista-Avila*, 6 F.3d 1360, 1362 (9th Cir. 1993), though on its face, "casual association" certainly sounds like a "slight connection."

As Judge Easterbrook has observed, the phrase "slight connection" is ultimately best understood to mean that "if

someone joins the conspiracy, 'slight' activity to accomplish its objectives is enough, that peripheral conspirators commit the crime no less than the mastermind." *See de Ortiz*, 883 F.2d at 524. "This interpretation follows the definition of the crime (agreement plus one overt act) and is not troubling. That we have to tease it out of a formula with dubious alternative meanings, though, is a mark against its use." *Id.* A panel of the Second Circuit has agreed. *See United States v. Huezo*, 546 F.3d 174, 184–85 (2d Cir. 2008) (Newman, J., concurring, joined by Walker, J., and Sotomayor, J., in relevant part).

Here, there is no doubt that Grasso committed overt acts in furtherance of the conspiracy. As the panel opinion explains, Grasso "assisted his co-conspirators in convincing lenders that various properties were sold for more than their actual sales prices." Maj. Op. at 16–17. He also "personally inflated the MLS listings in the Claridge Drive and Alta Drive transactions." Maj. Op. at 17. We therefore have no occasion to consider whether our case law repeating the "slight connection" standard is a useful statement of the law "when the issue for review concerns whether the defendant was connected with the conspiracy at all," *see Dunn*, 564 F.2d at 357 n.21, or whether, instead, the use of the phrase "slight connection"  should be abandoned as ambiguous and misleading.

## II.

I respectfully dissent from Part II.D. Under our case law, Grasso's convictions for money laundering cannot stand.

## A.

As the majority recognizes, under the statute here applicable, 18 U.S.C. § 1956 (2006), now superseded,[2] a defendant ordinarily could not be charged with both a criminal offense and a separate money laundering offense for the same conduct, when the "very nature of the scheme require[d] . . . [the] payment[]" that is charged as money laundering. *See United States v. Van Alstyne*, 584 F.3d 803, 814 (9th Cir. 2009). Such double charging — which we have denominated the "merger problem" — was only permissible if the government proved that the payment charged as money laundering was made with the "profits (as opposed to gross proceeds)" of the underlying scheme. *See United States v. Ali*, 620 F.3d 1062, 1072 (9th Cir. 2010). To determine whether a money laundering charge triggered the "merger problem," we "must focus on the concrete details of the particular scheme" underlying the separate criminal charges against the defendant. *See Van Alstyne*, 584 F.3d at 815 (internal quotation marks omitted).

As is clear from the majority's own explanation of the intricacies of the scheme in which Grasso was involved, the money laundering counts charged Grasso with conducting payment of "essential expenses of" the bank fraud with which Grasso was also charged. *See United States v. Santos*, 553 U.S. 507, 528 (2008) (Stevens, J., concurring). The bank fraud count charged Grasso with carrying out a "scheme and artifice to defraud the victim lenders," including Lehman Brothers, GreenPoint Bank, and RBC Mortgage Company. *See* 18 U.S.C. § 1344. "[I]nstrumental to the co-conspirators'

---

[2] *See* 18 U.S.C. § 1956(c)(9) (2009).

operation" was their use of Cal Title — in which Grasso held an "ownership interest" — "to prepare . . . title insurance policies . . . with [an] inflated purchase price." *See* Maj. Op. at 6, 9. The co-conspirators then "provided" the falsified title reports "to the lender[s]," to obtain inflated loans. *See id.* at 9. "Although Abrams and Fitzgerald [initially] attempted to use other title companies for their transactions, these companies soon declined to work with them, and Abrams and Fitzgerald began using Cal Title exclusively, whether or not Grasso . . . was acting as the agent for the transaction." *See id.* Relevant here, Abrams and Fitzgerald used Cal Title to submit lenders with false title reports for the Benedict Canyon and Yoakum Drive transactions.

The money laundering counts, in turn, charged Grasso with successfully demanding that his co-conspirators — Abrams and Fitzgerald — pay him commissions for their use of Cal Title in carrying out the Benedict Canyon and Yoakum Drive transactions. *See* 18 U.S.C. § 1956(a)(1)(A)(i). Without Cal Title, the scheme could not have generated the false title reports necessary to obtain inflated loans from the defrauded lenders. Grasso "forbade" his co-conspirators from using Cal Title unless they paid him a commission. *See* Maj. Op. at 9. "The very nature of the scheme thus required" the co-conspirators to make regular commission payments to Grasso. *See Van Alstyne*, 584 F.3d at 815.

Nor is it of any moment that, as the government argues, the payments to Grasso for services provided also "promote[d] future fraud." The Fourth Circuit recently rejected a similar argument in a case reversing a defendant's money laundering convictions arising out of an "extensive mortgage fraud conspiracy." *See United States v. Cloud*, 680 F.3d 396, 399 (4th Cir. 2012). The scheme there at issue

"involved convincing people to invest in real estate properties that, unbeknownst to the buyers, Cloud had recently purchased for a lesser amount. The scheme also involved falsification of loan applications . . . ." *See United States v. Abdulwahab*, 715 F.3d 521, 530 (4th Cir. 2013) (discussing *Cloud*, 680 F.3d at 399–400) (internal citation omitted). Cloud "lured his coconspirators with promises of payment," including commissions for recruiting buyers to the scheme. *See Cloud*, 680 F.3d at 405, 407. In response to the government's contention that the payments were designed only "to perpetuate the scheme," and therefore constituted promotional money laundering, *see* 18 U.S.C. § 1956(a)(1)(A)(i), the court emphasized that the payments were also for "services performed," namely for "past and essential expenses of [the] mortgage fraud conspiracy," *Cloud*, 680 F.3d at 407–08.

Indeed, *any* payment for services already rendered in the context of a fraud scheme also promotes future fraudulent activity by the person paid, by creating an expectation that the person will be paid again. In any case involving ongoing fraud, the government's approach — which, I note, the majority does not endorse — would obliterate the limitations our cases have set forth regarding the merger problem.

Because the government introduced no evidence that the Benedict- and Yoakum-related commission payments were made with profits, as opposed to gross revenues, of the overall bank fraud scheme, Grasso's convictions for money laundering must be reversed. *See Van Alstyne*, 584 F.3d at 815.

## B.

To avoid the straightforward result compelled by our precedents, the majority points to four reasons why the transactions charged as money laundering, despite being necessary to the fraud scheme, supposedly pose no merger problem.  None of the majority's theories works.

## 1.

First, contrary to the majority's assertion, the payments to Grasso for the Benedict and Yoakum transactions did not "hinder[] the scheme."  *See* Maj. Op. at 33.  For that dubious proposition, the majority relies on our decision in *Van Alstyne*, in which we construed a "Ponzi scheme [that] depended on attracting new investments and using some but not all of the amount collected to pay returns to earlier investors."  *See Van Alstyne*, 584 F.3d at 815.  We held that "distribution checks" periodically issued to individual investors pursuant to the scheme were not chargeable as both mail fraud and money laundering.  *Id.*  The checks were funded not by any investment returns, "but by the investors' own principal," and were issued to cause investors to "believe[] they had invested wisely," and to encourage them to invest additional funds.  *See id.* at 808–09, 815.  Because issuance of the checks was necessary to inspire investor confidence in the Ponzi scheme and to attract additional investment, the distribution checks were "a central component of the scheme to defraud," and therefore ran squarely into the merger problem.  *See id.* at 815 (internal quotation marks omitted).

With regard to a separate transaction — on which the majority focuses — we held that there was no merger

problem. *See id.* at 815–16. That transaction was a "full[] refund[]" of "one investor's [initial] outlay," pursuant to that investor's demand. *See id.* at 815. "Returning the entire amount of th[at] . . . investment," we explained, "undermined rather than advanced the core scheme, as the funds returned . . . would not be available to lull other investors into maintaining their investment." *Id.* at 815–16.

Unlike the full refund in *Van Alstyne*, Grasso's commission payments for use of Cal Title were "essential expenses" of the underlying fraudulent scheme. *See Santos*, 553 U.S. at 528 (Stevens, J., concurring). As explained, after some time, Cal Title was the only title company that Grasso's co-conspirators could use to generate the necessary false reports. To use Cal Title, the conspirators had to pay Grasso a commission. Like the periodic distribution payments that presented a merger problem in *Van Alstyne*, the commission payments to Grasso prevented the scheme from using some amount of funds to expand the scheme even further, but that is always the case when a scheme pays its "*essential*" "operating" "expenses," such as the commissions paid to the "runners" who "gathered bets from gamblers" in the lottery scheme in *Santos*. *See id.* (emphasis added); *id.* at 509 (plurality opinion). By construing a necessary payment as somehow undermining the fraud, the majority's strained analogy to the money laundering count upheld in *Van Alstyne* threatens to eviscerate *Santos*'s core holding.

**2.**

The majority fares no better by contending that the merger problem vanishes because Abrams paid Grasso commissions only for the Benedict and Yoakum transactions, and not for other fraudulent transactions carried out earlier.

*See* Maj. Op. at 32. Abrams's commission payments to Grasso were in fact an integral part of each instance of bank fraud once title companies other than Cal Title refused to participate in the conspirators' scheme.

In support of its pronouncement that the payments to Grasso for services rendered were "irrelevan[t] to the overarching fraud[ulent] scheme," Maj. Op. at 33, the majority relies on a case which, on plain error review, construed eighteen monetary transactions to the defendant's personal bank account as not "central to carrying out the scheme's objective[s]," *United States v. Bush*, 626 F.3d 527, 533, 537–38 (9th Cir. 2010). Again, "the concrete details of the particular scheme" must be examined to understand the context for the court's analysis. *See Van Alstyne*, 584 F.3d at 815 (internal quotation marks omitted).

In *Bush*, the transactions charged as money laundering were complete *before* some of the conduct separately charged as fraud was even carried out. *See Bush*, 626 F.3d at 537–38. There was no merger problem with regard to separate wire-fraud charges — related to a Ponzi scheme — because the "necessity of the transfers . . . was limited to Bush's personal interest in veiling the sources of his income from public authorities." *Id.* at 538. The court explained that the transactions were made only after authorities began investigating his business associates; "[r]ather than risk investors sending money directly to his [business] account, Bush deflected attention by steering the investments overseas first." *Id.* As the court appropriately recognized, "[t]aking additional steps to hide completed criminal activity is not central to the solicitations necessary for a Ponzi scheme to continue operating." *Id.*

Here, Grasso's demands that his co-conspirators pay him commissions essential to the *ongoing* fraudulent scheme cannot fairly be analogized to the transactions in *Bush*. The commissions were not simply payments for participation in the conspiracy but for providing an essential *service*, once the service was not otherwise obtainable.

### 3.

Nor is the merger problem mitigated by the fact that the money laundering count exposed Grasso "only" to "an additional 20 years of imprisonment," beyond the 30-year "statutory maximum for the underlying bank fraud charge." *See Bush*, 626 F.3d at 538; Maj Op. at 33.

As an initial matter, it is far from clear that under our case law, the extent of the increase in the statutory maximum sentence is a relevant consideration in determining whether the merger problem exists. In *Van Alstyne*, we noted that the Sixth Circuit held that proceeds "'means profits *only* when the § 1956 predicate offense creates a merger problem that leads to a *radical increase in the statutory maximum sentence* and only when nothing in the legislative history suggests that Congress intended such an increase.'" *Van Alstyne*, 584 F.3d at 814 (quoting *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009)) (emphasis added). We nonetheless construed the *Santos* plurality and concurrence differently from the Sixth Circuit, holding that there was a merger problem based on the defendant's conviction for both mail fraud and money laundering, without regard to the applicable statutory maximums — 30 years for mail fraud and 20 years for money laundering. *See id.*; 18 U.S.C. §§ 1341, 1956. Indeed, *Van Alstyne* nowhere mentioned the statutory maximum for mail fraud in its consideration of the merger problem. The case on

which the majority relies, *Bush* — again decided on plain error review, *see* 626 F.3d at 533 — followed the Sixth Circuit's approach, rather than our own.[3]

In any event, the extent of the "additional" sentencing exposure that Grasso "face[d]" as a result of the money laundering charge, *see Santos*, 553 U.S. at 516, was identical to what Van Alstyne faced, *see Van Alstyne*, 584 F.3d at 809 (noting that Van Alstyne was convicted of mail fraud in violation of 18 U.S.C § 1341); 18 U.S.C § 1341 (providing a statutory maximum of 30 years). As we are bound by precedents involving "nearly identical facts," *see United States v. Vasquez-Ramos*, 531 F.3d 987, 989 (9th Cir. 2008) (per curiam), the statutory maximums at issue are simply not a basis for treating Grasso's case differently than Van Alstyne's. Nor, were we considering the issue ab initio, could it fairly be said that a 20-year increase of a 30-year sentence is not "radical[]," *see Santos*, 553 U.S. at 517, in the ordinary sense of being "marked by a considerable departure from the usual or traditional," *see* Webster's Collegiate Dictionary 1025 (11th ed. 2003) (defining "radical").

**4.**

The majority's final rationale for resisting the merger problem here is that there is ostensibly no such problem when a "money laundering conviction is based on . . . transfers to co-conspirators." *See* Maj. Op. at 34. To be sure, some

---

[3] *United States v. Phillips*, 704 F.3d 754 (9th Cir. 2012), also cited by the majority, also reviewed a money laundering conviction only for plain error, *id.* at 762, and followed *Bush*, rather than *Van Alstyne*, in assessing the relevance of the increase in the defendant's sentence, *see id.* at 766 n.11.

transfers of funds among co-conspirators raise no merger problem. But while some such transfers merely involve co-conspirators "reaping the fruits of their crimes," others represent payments of essential expenses of a fraud scheme. *See Cloud*, 680 F.3d at 406 n.4. In the latter instance, a merger problem plainly exists.

Again, the Fourth Circuit's cogent analysis is instructive. In *Cloud*, several of the money laundering convictions reversed on appeal involved payments to co-conspirators; "it was only through the promise of these payments that Cloud was able to persuade his coconspirators to do business with him." *Abdulwahab*, 715 F.3d at 531. In so concluding, the Fourth Circuit carefully examined the "nature of the payment" and its relevance to the scheme. *Cloud*, 680 F.3d at 406 n.4; *accord Van Alstyne*, 584 F.3d at 815. The court distinguished the scheme that Cloud perpetuated from the scheme in an earlier case, *United States v. Halstead*, 634 F.3d 270 (4th Cir. 2011), in which co-conspirators orchestrated insurance fraud. The *Halstead* defendants were charged with money laundering only because ill-gotten funds were ultimately transferred to their checking accounts. *Cloud*, 680 F.3d at 406 n.4 (citing *Halstead*, 634 F.3d at 273, 279). In *Halstead*, the fact that the defendants ultimately paid themselves posed no merger problem, as they "were not paying the expenses of the fraud, but rather were reaping the fruits of their crimes." *Cloud*, 680 F.3d at 406 n.4.

The majority misconstrues our own case law in concluding that we have foreclosed all *Santos*-based challenges to money laundering convictions simply because predicated on payments to co-conspirators. In *Van Alstyne*, for instance, we noted that a "'merger' problem may . . . be triggered when multiple participants share profits." 584 F.3d

at 815. The two cases on which the majority relies — *United States v. Webster*, 623 F.3d 901 (9th Cir. 2010), and *United States v. Wilkes*, 662 F.3d 524 (9th Cir. 2011) — are not to the contrary.

*Webster* involved a conspiracy to distribute methamphetamine. *See Webster*, 623 F.3d at 905. Webster argued on appeal that given the charges for conspiracy to possess with intent to distribute methamphetamine, 21 U.S.C. § 846, and possession with intent to distribute methamphetamine, 21 U.S.C. § 841(a)(1), *Santos* barred an additional charge for money laundering, without proof that the "proceeds" involved in the relevant transactions represented "profits." *Webster*, 623 F.3d at 905. *Webster* did not specify the transactions that gave rise to the money laundering charge, and nothing in the opinion indicates that the charge was for transactions involving "essential expenses" of the underlying drug conspiracy. *See Santos*, 553 U.S. at 528 (Stevens, J., concurring).[4] We rejected Webster's challenge to his money laundering conviction, explaining that under the relevant statutes, the drug crimes with which Webster was charged "need not involve the exchange of money"; there was accordingly no merger problem. *See Webster*, 623 F.3d at 906. We also noted that Justice Stevens's concurrence in *Santos* took the position that the legislative history of the money laundering statute, 18 U.S.C. § 1956, indicated that no merger problem exists in the particular case in which a money laundering charge is based on a transaction involving "'gross revenues from the

---

[4] My review of Webster's briefs on appeal, and his letter pursuant to Rule 28(j) in which he initially raised the merger argument, confirms that Webster never argued that the transactions were for expenses necessary to consummate the charged drug crimes.

sale of contraband and the operation of organized crime syndicates involving such sales.'" *Id.* (quoting *Santos*, 553 U.S. at 526 (Stevens, J., concurring)). Because the four dissenting Justices in *Santos* agreed with Justice Stevens in that regard, *see Santos*, 553 U.S. at 531–32 (Alito, J., dissenting), we concluded that a majority of the Supreme Court had held that no merger problem existed where "a money laundering count is based on transfers among co-conspirators of money from the sale of drugs." *Webster*, 623 F.3d at 906. As the majority recognizes, *see* Maj Op. at 29, *Webster* alone does not stand for the broad proposition that payments to co-conspirators more generally present no merger problem.

Turning to *Wilkes*, the defendant was charged with honest services wire fraud, bribery, and money laundering, in connection with a scheme to bribe a member of Congress, Randall "Duke" Cunningham. *See* 662 F.3d at 530. Cunningham secured "millions of dollars in appropriations for . . . [the] benefit" of Wilkes and another co-conspirator. *Id.* at 531. "[T]hrough a complicated series of financial transactions among multiple companies, Wilkes paid off $525,000 on Cunningham's second mortgage." *Id.* Wilkes was charged with money laundering for making a wire transfer in the course of those transactions. On appeal, Wilkes argued that the wire transfer at issue was "merely an expense associated with the bribery, and, thus, not 'proceeds.'" *Id.* at 549. *Wilkes* explained that unlike the defendant in *Santos*, who was charged with *promotional* money laundering, Wilkes was charged with *concealment* money laundering. *Id.* Rather than using funds associated with the bribery scheme to remit payment directly to Cunningham, "Wilkes transferred the $525,000" from one of his companies, to "another of his accounts, WBR Equities."

*Id.* at 547. The panel emphasized the measures that Wilkes took to disguise the source of the funds:

> Wilkes could have sent the $525,000 from WBR Equities to Cunningham or Coastal Capital directly. Again, he did not. Instead, he wired $525,000 from WBR Equities to Parkview Financial, Inc. In the meantime, Parkview Financial and Coastal had engaged in a series of transactions of their own, which provided additional buffers between the corrupt contract and the payoff of Cunningham's mortgage. Concealing this connection appears to be the dominant, if not the only, purpose of these multi-layered transactions.

*Id.* Because of the extensive steps Wilkes took to conceal the source of the funds, Wilkes's conduct was separately chargeable as concealment money laundering, rather than just as a transaction "that involve[d] nothing but the initial crime," namely bribery. *See id.* at 547, 549. No merger problem therefore existed.

*Wilkes* also noted that as in "*Webster*, Wilkes's money laundering count was based on a transfer to a co-conspirator of money" from a scheme "such that 'proceeds' would include all 'receipts' from" that scheme. *See id.* at 549. But the opinion contained no analysis in support of that conclusion. *See id.* Unlike the majority, I do not read *Wilkes* for the expansive proposition that whenever a "transfer to a co-conspirator" occurred, there could, ipso facto, be no merger problem.

First, as a three judge panel, absent intervening controlling authority — of which there has been none — *Wilkes* could not have overruled *Van Alstyne*, in which we noted that a "'merger' problem may . . . be triggered when multiple participants share profits." 584 F.3d at 815; *see Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). Second, as noted, *Wilkes* expressly rejected the defendant's characterization of the "multi-layered transactions" as essential elements of the overall bribery scheme. *Wilkes*, 662 F.3d at 547. Instead, the court held that the wire transfers were "additional act[s]" separately chargeable as concealment money laundering. *Id.* at 547, 549. The majority's broader reading of *Wilkes* is foreclosed by the fact that unlike in Grasso's case, *Wilkes* involved no payments "necessary" to the scheme.[5] *See Van Alstyne*, 584 F.3d at 815.

In short, neither *Webster* nor *Wilkes* — individually or collectively — can sustain the weight that the majority places on them. Neither case dealt with a payment to a co-conspirator involving essential expenses of the underlying scheme. *Webster* was, in the Fourth Circuit's useful parlance, a case in which the defendant merely "reap[ed] the fruits of [his] crimes." *See Cloud*, 680 F.3d at 406 n.4. *Wilkes* involved a money laundering charge that did not merge with the bribery count because it was separately chargeable as concealment money laundering. *See Wilkes*, 584 F.3d at 815.

---

[5] Notably, the government has not defended Grasso's money laundering convictions on the ground that they were "additional acts" separately chargeable as concealment money laundering.

## C.

Only by reading a series of heretofore nonexistent rules into our case law does the majority avoid the conclusion that Grasso's money laundering convictions are barred by *Santos* and its progeny.  Because a proper analysis of "the concrete details of the particular scheme" with which Grasso was charged reveals that the additional money laundering charges pose an unequivocal merger problem, I would reverse Grasso's money laundering convictions.  *See Van Alstyne*, 584 F.3d at 815 (internal quotation marks omitted).