**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
      *Plaintiff-Appellee,*

v.

LAMAR WEBSTER,
      *Defendant-Appellant.*

No. 09-30173

D.C. No.
1:07-cr-00128-
RFC-1

OPINION

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, Chief District Judge, Presiding

Argued and Submitted
June 9, 2010—Portland, Oregon

Filed September 30, 2010

Before: Cynthia Holcomb Hall, David R. Thompson and
M. Margaret McKeown, Circuit Judges.

Opinion by Judge Thompson

16627

## COUNSEL

Larry Jent, Bozeman, Montana, for the appellant.

Leif M. Johnson, Assistant United States Attorney, Billings, Montana, for the appellee.

## OPINION

THOMPSON: Senior Circuit Judge:

Lamar Webster was convicted of (1) conspiracy to possess with intent to distribute methamphetamine, 21 U.S.C. § 846,

(2) possession with intent to distribute over 500 grams of methamphetamine, 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2, (3) money laundering conspiracy, 18 U.S.C. §§ 2, 1956(h), and (4) money laundering, 18 U.S.C. § 1956(a)(1)(A)(I).

We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## BACKGROUND

An investigation into methamphetamine dealing in Billings, Montana, began in December 2004. Undercover officer Mike Gilluly of the Billings Police Department developed a relationship with an informant who made several controlled buys from Richard Todd. In May 2005, Gilluly purchased three ounces of crystal methamphetamine directly from Todd, who was arrested and charged with drug crimes. Additional information led to four more arrests. The five defendants pleaded guilty and agreed to cooperate with law enforcement.

In December 2008, Lamar Webster was tried on four counts related to the methamphetamine dealing: (1) conspiracy to possess with intent to distribute methamphetamine, 21 U.S.C. § 846, (2) possession with intent to distribute over 500 grams of methamphetamine, 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2, (3) money laundering conspiracy, 18 U.S.C. §§ 2, 1956(h), and (4) money laundering, 18 U.S.C. § 1956(a)(1)(A)(I).

The four-day jury trial included testimony by Mike Gilluly, Richard Todd, and several of Todd's co-conspirators. The prosecution sought admission of a proposed exhibit containing the crystal methamphetamine purchased by Gilluly. The district court denied that motion. However, several wire transfers were admitted without objection.

The district court instructed the jury on the four counts. Notably, the instructions for Webster's money laundering and

money laundering conspiracy counts referred to the "proceeds" of unlawful activities. For example, one element of the money laundering charge required proof "the defendant knew that the property represented the proceeds of the illegal distribution of methamphetamine." The district court did not define "proceeds." The jury returned guilty verdicts on all four counts.

On appeal, Webster challenges the admission of the testimony concerning the proposed methamphetamine exhibit, and the admission of a business record of a $300 wire transfer identifying Webster as the recipient. In addition, Webster filed a letter in this appeal pursuant to Federal Rule of Appellate Procedure 28(j) challenging the district court's failure to define "proceeds" in the jury instructions. Webster also contends we should reverse all counts for insufficiency of the evidence.

## I.  Testimony Concerning Proposed Methamphetamine Exhibit

At Webster's trial, the prosecution proposed Exhibit 7, which Officer Gilluly identified as including some of the crystal methamphetamine he bought from Todd, as well as two other samples generated from the original by the crime lab. The government then sought to move the samples into evidence. At sidebar, the attorneys discussed whether the sample could be directly connected to Webster, in light of Webster's apparent withdrawal from the conspiracy by 2005. The government attorney conceded, "I'm not going to argue that it's his," and the court reserved ruling on the admissibility of the exhibit. On cross-examination, Gilluly admitted he "never met Mr. Webster."

The government also asked Richard Todd about the proposed exhibit. Todd explained he sold "crystal meth" to Gilluly, which is "the type of methamphetamine that [Todd] had received from Lamar Webster in 2003 and 2004." Todd then

compared two packets in the proposed exhibit. He identified the crystal meth he sold to Gilluly and explained that it was more pure than a powdery sample.

The government then stated in open court: "Your Honor, understanding that it's not methamphetamine that is directly attributable to this defendant, for demonstrative purposes, for illustrative purposes, we move 7." The defense objected and the court sustained the objection. The testimony pertaining to the exhibit was not stricken.

[1] Webster argues that the probative value of that testimony was substantially outweighed by the danger of its unfair prejudice, requiring exclusion under Federal Rule of Evidence 403. We disagree. The district court did not abuse its discretion by refusing to strike the testimony pertaining to the proposed exhibit. *See United States v. Tran*, 568 F.3d 1156, 1162 (9th Cir. 2009) (describing the standard of review for evidentiary rulings). The proposed exhibit was never shown to the jury and was excluded from evidence. The jury was informed that the drugs mentioned in the exhibit were not connected to Webster. The line of questioning pertaining to the exhibit was directed at educating the jury about the various forms of methamphetamine and not at making a connection between the drugs mentioned in the exhibit and Webster.

## II.   Wire Transfer

The record keeper of Western Union testified on behalf of the prosecution. During this testimony, the prosecution moved for the admission of two exhibits related to a wire transfer allegedly received by Webster. The district court admitted the exhibits concurrently without objection.

Exhibit 14A is Western Union's record of a $300 wire transfer sent on December 22, 2003, from "Kelly Mayes" in Billings, Montana. The money was received in Hayward, California, on December 23, 2003. The record also includes the

recipient's name, "Lamar Webster," as provided by the sender. Western Union did not require the actual recipient to show identification.

Exhibit 14B is a $300 Western Union check payable to "Lamar Webster" issued on December 23, 2003, and cashed at the same Hayward store. The check also identifies Billings, Montana, as the check's place of origin. The check is signed by "Lamar Webster" as payee.

Both Kelly Mayes and Richard Todd testified they sent the wire transfer to Webster. Richard Todd testified he sent the wire transfer to Webster on or about December 23, 2003, in response to Webster's request. Kelly Mayes, Todd's then-wife, testified that she wired Webster $300 on one occasion per Todd's request.

On appeal, Webster contends that the recipient's name, "Lamar Webster," is an out-of-court statement by the sender and is inadmissible hearsay within hearsay. He concedes, however, that the remainder of Exhibit 14A is admissible under the "business records exception" to the hearsay rule, *see* Fed. R. Evid. 803. Because Webster did not object to the admission of the exhibit into evidence, plain error review applies. *United States v. Vences*, 169 F.3d 611, 613 (9th Cir. 1999).

**[2]** The recipient's name is admissible under Federal Rule of Evidence 801(d)(2)(E) as an admission by a party-opponent—a co-conspirator statement made in the course and furtherance of the conspiracy. Testimony established that the senders of the wire transfer were Webster's co-conspirators and the wire transfer was relevant to the conspiracy. *See infra* Part IV. However, even if the admission of the recipient's name was error, the error was harmless in light of corroborating evidence that Webster was the recipient. In particular, Exhibit 14B, the Western Union check payable to "Lamar Webster," involved the same amount, issued from the same

place of origin, and was cashed at the same store on the same date. Furthermore, the payee's signature on that check was comparable to Webster's signature on his driver's license—an exhibit also admitted into evidence.

## III. Jury Instructions for Counts (3) and (4)—Money Laundering Conspiracy and Money Laundering

In instructing the jury on the money laundering counts, the district court did not define "proceeds" as "profits," a failing which Webster now challenges for the first time. Because Webster did not raise a timely objection to the instructions, we review for plain error. *United States v. Moreland*, No. 05-30541, slip op. at 14318 (9th Cir. Sept. 17, 2010).

Webster contends our decision in *Moreland* compels the conclusion that the district court's failure to define "proceeds" as "profits" in the jury instructions constitutes plain error. *See Moreland*, slip op. at 14319-320 (discussing and applying *United States v. Santos*, 553 U.S. 507, 128 S. Ct. 2020 (2008)). We disagree.

**[3]** In *United States v. Santos*, defendant Santos was convicted of gambling and money laundering crimes. 128 S. Ct. at 2023. The Court addressed the question whether "proceeds," left undefined in the definition of money laundering in 18 U.S.C. § 1956, is defined as "profits" or "receipts" (also called "gross receipts").[1] After concluding that no definition predominated, a plurality determined the rule of lenity required the narrower "profits" definition be adopted. *Id.* at 2024 (Scalia, J., joined by Souter, Thomas, & Ginsburg, J.J.,

---

[1]One month after the district court entered judgment in this case, Congress amended 18 U.S.C. § 1956 to define "proceeds" as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). Because the amended definition matches the applicable definition of "proceeds" in this case, we need not consider the effect of the intervening amendment.

and announcing the judgment of the Court). The plurality went on to note that if the "receipts" definition were adopted instead, a "merger problem" would arise, as "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery." *Id.* at 2026. *Compare id.* at 2035-36 (Alito, J., dissenting, joined by Roberts, C.J., Kennedy & Breyer, J.J.) (determining that "proceeds" "means 'the total amount brought in,' the primary dictionary definition" and relying on "what the term 'proceeds' customarily means in . . . a money laundering statute"); *id.* at 2032-33 (Stevens, J., concurring in the judgment) (considering both the "merger problem" and legislative history and concluding the Court need not pick a single definition of "proceeds").

**[4]** In *United States v. Van Alstyne*, we observed that "the desire to avoid a 'merger problem' united the five [J]ustices who held that Santos' payments to winners . . . did not constitute money laundering. . . . We therefore view the holding that commanded five votes in *Santos* as being that 'proceeds' means 'profits' where viewing 'proceeds' as 'receipts' would present a 'merger' problem of the kind that troubled the plurality and concurrence in *Santos*." 584 F.3d 803, 809, 814 (9th Cir. 2009). *See also Moreland*, slip op. at 14319 (determining payments of commissions in a fraudulent pyramid scheme "raise the same merger problem condemned in *Santos* and *Van Alstyne*, as commissions were central to carrying out the scheme's objective of encouraging further investment").

**[5]** In addition to the money laundering crimes, Webster was charged with conspiracy to possess with intent to distribute methamphetamine, 21 U.S.C. § 846, and possession with intent to distribute over 500 grams of methamphetamine, 21 U.S.C. § 841(a)(1); 18 U.S.C. § 2. These drug crimes do not merge with the money laundering crimes, because the drug crimes need not involve the exchange of money. *See, e.g.,*

*United States v. Ramirez*, 608 F.2d 1261, 1264 (9th Cir. 1979) (affirming a conviction for distribution of cocaine under 21 U.S.C. § 841(a)(1) where the defendant shared the drug with others, but "apparently no commercial scheme [wa]s involved"). Because neither the conspiracy nor the drug possession count against Webster presents a merger problem, neither requires narrowly defining "proceeds" as "profits" for the money laundering counts.

**[6]** We recognize that four Justices in the *Santos* plurality stated that the merger problem might exist for certain payments among conspirators. *See* 128 S. Ct. at 2026-27 (Scalia, J., joined by Souter, Thomas, & Ginsburg, J.J.) (stating, "any wealth-acquiring crime with multiple participants would become money laundering when the initial recipient of the wealth gives his confederates their shares"). However, this minority view is not controlling. Moreover, five Justices in *Santos* expressly agreed that "the legislative history of § 1956 makes it clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." *Id.* at 2032 (Stevens, J., concurring in the judgment); *see id.* at 2035 & n.1 (Alito, J., dissenting).

We, therefore, read *Santos* as holding that where, as here, a money laundering count is based on transfers among co-conspirators of money from the sale of drugs, "proceeds" includes all "receipts" from such sales. *See Klamath Siskiyou Wildlands Ctr. v. U.S. Bureau of Land Mgmt.*, 589 F.3d 1027, 1034 (9th Cir. 2009) (explaining that, when the Supreme Court issues "no majority opinion and the plurality takes a legal position more far-reaching than the position of a concurring [J]ustice or [J]ustices[,] . . . the narrowest view that commands a majority of [J]ustices is the law" (citing *Marks v. United States*, 430 U.S. 188, 193 (1977))). Because the broad "receipts" definition of "proceeds" was permissible, the district court did not err in its jury instructions by failing to define "proceeds" narrowly to mean "profits."

## IV.   Sufficiency of the Evidence

We review de novo claims of insufficiency of the evidence. *See United States v. Mincoff*, 574 F.3d 1186, 1191-92 (9th Cir. 2009). Evidence is sufficient if, when viewed " 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting, with alterations, *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007)).

### Count (1): Conspiracy to Possess with Intent to Distribute Methamphetamine

Webster contends that his conviction under count (1) was wrongfully based on proof of a mere agreement to sell methamphetamine, in violation of *United States v. Lennick*, 18 F.3d 814, 819 n.4 (9th Cir. 1994) (holding that a sale of drugs does not establish a conspiracy; rather, "the government must show that the buyer and seller had an agreement to further distribute the drug in question"). Webster also argues the government failed to prove that he intended to commit the underlying offense.

The government points to testimonial evidence showing that Webster was aware of the drug distribution and benefitted from the distribution. Todd and Webster discussed Todd's "plan" to set up sales operations in Billings, Montana. In addition, Todd allegedly had a "little kickback relationship" with Webster. Todd explained that, as sales grew, Todd told Webster: "You know, I appreciate what you're doing for me. I'm going to go ahead, and I'm going to give you a couple hundred bucks." Also, Webster allegedly "pitched in" a free extra half-pound of methamphetamine upon Todd's promises to "double [Webster's] money."

Todd also suggested that Webster personally assisted the downstream distribution. Todd testified that Webster was present when tires were packed with methamphetamine. Web-

ster allegedly drove with Todd from California to Billings, where they removed the spare tire from Todd's father's truck and delivered the tire to a recipient.

[7] A reasonable trier of fact could have found Webster guilty of count (1). The testimony and the quantities of drugs sold (up to two pounds at a time) suggest that Webster was aware of the buyer's resale activities, and, thus, implicitly agreed to further distribution of the methamphetamine. Furthermore, Webster financially benefitted from that distribution. The jury was entitled to find that Webster had the required intent.

### Count (2): Possession with Intent to Distribute Over 500 Grams of Methamphetamine

For count (2), the prosecution was required to prove that Webster knowingly possessed methamphetamine on or about December 22, 2003, in Billings, Montana, with intent to distribute it. The government argues that Webster is guilty under count (2) either as a co-conspirator under *Pinkerton v. United States*, 328 U.S. 640, 645-47 (1946), or as an aider and abetter. *See United States v. Tran*, 568 F.3d 1156, 1167 (9th Cir. 2009) (explaining the legal theories that can support a conviction for possession with intent to distribute).

Webster is guilty under *Pinkerton* co-conspirator liability if Webster joined the conspiracy by about December 22, 2003, and a member or members of the conspiracy committed the alleged criminal act then or thereafter. Todd testified he began buying methamphetamine from Webster just before Thanksgiving in 2003. Todd drove the first three-ounce package to Billings, and after selling it, Todd proceeded, by Christmas, to buy and then sell four ounces, and then eight ounces, from Webster. In the last days of December, Todd bought and received a one-pound shipment from Webster.

[8] We conclude that sufficient evidence supports Webster's conviction for count (2) based on *Pinkerton* co-

conspirator liability. Todd testified to the existence of a methamphetamine distribution operation. Also, the jury could conclude that, by December 22, 2003, Webster intended to join and did join the conspiracy. Webster's complicity is evidenced by the frequency and quantities of drugs sold by him to conspirators, the $300 wire transfer sent from conspirators to Webster on December 22, and Todd's testimony that, at the time of Todd's first purchase, he told Webster about his plan to sell methamphetamine in Billings.

### Counts (3) and (4): Money Laundering Conspiracy and Money Laundering

"To support a conviction for money laundering under 18 U.S.C. § 1956(a)(1), the government must prove [Webster] (1) engaged in a financial transaction which involved proceeds from specified illegal activity, (2) knew the proceeds were from illegal activity, and (3) intended the transaction . . . to promote the illegal activity." *United States v. Marbella*, 73 F.3d 1508, 1514 (9th Cir. 1996).

The two money laundering counts are based on Webster's alleged receipt of the $300 wire transfer from his co-conspirators. Webster argues there is no proof that he knew the proceeds were from illegal activity or that he intended the transaction to "promote" drug dealing, relying on testimony stating that the money was wired to Webster as a "loan."

[9] We conclude that sufficient evidence supports Webster's money laundering convictions. A sender of the wire transfer testified that the money was "proceeds" from the drug distribution scheme, and that, when he expressed reservations about wiring the money, Webster assured him not to worry about it. Indeed, all financial dealings between the senders of the money and Webster centered on drug sales, which were occurring regularly during this period. Thus, the jury could rationally conclude that the "loan," like the prior "kickback,"

was intended to promote the drug distribution scheme and that Webster knew the proceeds were from illegal activities.

**AFFIRMED.**