**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. JIM ALLEN LOVELAND, *Defendant-Appellant.* | No. 13-30162 D.C. No. 1:12-cr-00155-BLW-14 OPINION |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted July 9, 2014
Submission Withdrawn March 16, 2015
Resubmitted May 26, 2016
Seattle, Washington

Filed June 3, 2016

Before: Alex Kozinski[*], Andrew J. Kleinfeld,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Kleinfeld

---

[*] Following the death of Judge Alarcón, Judge Kozinski was drawn to replace Judge Alarcón on the panel. Judge Kozinski has read the briefs, reviewed the record, and listened to the oral argument.

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's judgment and vacated a defendant's conviction and sentence for conspiracy to possess methamphetamine with intent to distribute.

The panel held that despite the substantial evidence of the defendant's possession for purposes of sale, there was insufficient evidence for a jury to conclude that he tacitly or explicitly made the requisite agreement for a conspiracy.

### COUNSEL

James K. Ball, Jr., (argued), Manweiler, Manweiler, Breen & Ball PLLC, Boise, Idaho, for Defendant-Appellant.

Lynne W. Lamprecht (argued) and Syrena Case Hargrove, Assistant United States Attorneys; Wendy J. Olson, United States Attorney, Boise, Idaho, for Plaintiff-Appellee.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

KLEINFELD, Senior Circuit Judge:

The government had a good case against Jim Loveland for the felony of possession of methamphetamine with intent to distribute. The evidence was persuasive that he committed that crime. His apparent guilt was conceded for purposes of discussion at oral argument. The barrier to convicting him of that felony was that he was not charged with it. He was charged instead with conspiracy to do that. Twelve other defendants were charged with him and convicted. But even though four of the others were charged with possession with intent to distribute, Loveland was not.

Conspiracy means an agreement to commit a crime, not commission of the crime.[1] Though that might sound less serious to a layman, lawyers know that the conspiracy charge affects much about trial and sentencing, all to the advantage of the prosecution. A conspiracy charge imposes one substantial disadvantage to the prosecution: the prosecution must prove the existence of the agreement beyond a reasonable doubt.[2] The agreement can be explicit or tacit, and can be proved by direct or circumstantial evidence, including inferences from circumstantial evidence,[3] but it still has to be proved. Without an agreement, there is no

---

[1] *See United States v. Lennick*, 18 F.3d 814, 818–19 (9th Cir. 1994).

[2] *See United States v. Tran*, 568 F.3d 1156, 1163–64 (9th Cir. 2009).

[3] *See United States v. Mincoff*, 574 F.3d 1186, 1192 (9th Cir. 2009).

conspiracy.[4]  Despite the substantial evidence of Loveland's possession for purposes of sale, there was insufficient evidence for a jury to conclude that he tacitly or explicitly made the requisite agreement.   Despite his apparent criminality, we are compelled under circuit precedent to vacate his conviction.

### Facts.

The government charged twelve defendants with conspiracy to possess with intent to distribute methamphetamine.  Nine pleaded guilty and cooperated with the prosecution.  Loveland, Jesus Sanchez, and Michael Morris proceeded to trial and were convicted.  We have affirmed Sanchez and Morris's sentences in separate dispositions.[5]  The indictment includes three counts charging some of the others with possession with intent to distribute, but not Loveland.  For Loveland, the government took it upon itself, by its charging decision, to prove conspiracy or nothing.

The evidence showed that during the relevant period the lead defendant, Jesus Guadalupe Sanchez,[6] imported about

---

[4] *See United States v. Feola*, 420 U.S. 671, 692 (1975) ("[T]he essence of conspiracy is agreement and persons cannot be punished for acts beyond the scope of their agreement."); *cf. United States v. Moe*, 781 F.3d 1120, 1124 (9th Cir. 2015) ("The elements of conspiracy are (1) an agreement to accomplish an illegal objective, and (2) the intent to commit the underlying offense." (internal quotation marks and citation omitted)).

[5] *See United States v. Sanchez*, 583 Fed. App'x 727 (9th Cir. 2014); *United States v. Morris*, 583 Fed. App'x 724 (9th Cir. 2014).

[6] Also known as Jose Salazar and Che.

two pounds of methamphetamine per month to Idaho from Mexico, Arizona, or California, which he bought for $10,000 a pound. He and his coconspirators resold the methamphetamine to a number of buyers, typically in one- or two-ounce lots, for about $1,200 per ounce. As might be expected in a felonious trade, many of the buyers were regulars, not strangers. Some of the regulars got caught, and one made a recorded purchase for law enforcement in order to get a better deal on sentencing. Several of the others pleaded guilty and testified in exchange for benefits.

At Loveland's jury trial, three of the coconspirators testified to repeated sales to Loveland of two ounces at a time, each time for $2,400. And each time, Loveland paid cash on delivery. There was testimony that the quantities he bought were too much for a person to consume himself without getting sick, so the jury could reasonably infer that Loveland bought the methamphetamine partly or entirely for resale.

Two of the coconspirators had different arrangements with Sanchez. Ben Vertner paid more,—$1,300 per ounce instead of $1,200—and had an explicit agreement with Sanchez to resell the drugs he bought. Mario Martinez sometimes was "fronted" the methamphetamine, which means he did not have to pay cash on delivery, and would instead pay for his inventory after he resold it. For Loveland, though, it was cash on the barrelhead every time—no discounts, no credit, and no agreement about what he would do with the drugs. Loveland would call when he wanted a delivery, and the conspirators would deliver the usual two one-ounce bags to his house and collect the usual $2,400. The testimony put the number of deliveries to Loveland somewhere between twelve and twenty. There was no

testimony supporting or implying any involvement by anyone in the Sanchez group with whatever reselling Loveland might have been doing.

Loveland moved unsuccessfully for judgment of acquittal at the close of the government's case, and at the close of evidence, based on insufficient evidence of conspiracy.[7] The jury returned a verdict of guilty of conspiring to possess with intent to distribute 50 grams or more of methamphetamine. The district court imposed a mandatory sentence of life imprisonment because Loveland had two prior convictions for felony drug offenses.[8]

## Analysis.

We review de novo claims of insufficiency of the evidence.[9] "Evidence is sufficient if, when viewed in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[10]

Conspiracy is an agreement to commit a crime, and the intent to commit the underlying offense.[11] We assume for purposes of decision that Loveland intended to commit the

---

[7] *See* Fed. R. Crim. P. 29(a).

[8] *See* 21 U.S.C. § 841(b)(1)(A).

[9] *United States v. Webster*, 623 F.3d 901, 907 (9th Cir. 2010).

[10] *Id.* (emphasis added) (internal quotation marks and citation omitted).

[11] *United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001); *see* 21 U.S.C. § 846.

crime of possession of methamphetamine for purpose of distribution.[12]  And we assume for purposes of decision that the Sanchez group knew Loveland was probably reselling the methamphetamine they sold to him, because the quantity exceeded what he could use himself.[13]  But Loveland's intent to possess for purpose of distribution and the Sanchez group's sales to him do not add up to conspiracy.[14]  The Sanchez group has to have agreed with Loveland, expressly or tacitly, that Loveland should resell the methamphetamine in order for them to have conspired together.[15]

We have a long line of decisions directed at the problem of distinguishing between sale of an illegal substance and conspiracy of the seller with the buyer for the buyer to resell.[16]  The parties agree that *United States v. Ramirez* and *United States v. Lennick* are the most challenging cases for the government, but disagree on whether Loveland's conviction can stand despite these precedents.

---

[12] *See* 21 U.S.C. § 841(a)(1).

[13] *Cf. United States v. Ocampo*, 937 F.2d 485, 488 (9th Cir. 1991) ("Possession of a large quantity of cocaine alone may be sufficient to infer both knowledge and intent [to distribute it].").

[14] *United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013).

[15] *United States v. Moe*, 781 F.3d 1120, 1124–25 (9th Cir. 2015).

[16] *See, e.g.*, *United States v. Lapier*, 796 F.3d 1090, 1095 (9th Cir. 2015); *Moe*, 781 F.3d at 1124–25; *Ramirez*, 714 F.3d at 1140; *United States v. Webster*, 623 F.3d 901, 907 (9th Cir. 2010); *United States v. Mincoff*, 574 F.3d 1186, 1193–94 (9th Cir. 2009); *United States v. Lennick*, 18 F.3d 814, 818–19 & n.4 (9th Cir. 1994).

*Lennick* held that the evidence was insufficient to support a conviction for conspiracy to distribute narcotics, where Lennick distributed marijuana, but there was no evidence that he had agreed with the people to whom he sold or gave the drugs that they should distribute it to others.[17] We held that even Lennick's knowledge of their distribution would not suffice without an intention and agreement that they would distribute to others.[18] "[C]onspiracy requires proof of 'an agreement to commit a crime other than the crime that consists of the sale itself.'"[19] The case before us is stronger for the government than *Lennick* on the facts because in *Lennick*, arguably, the quantities were too small to support an inference that Lennick knew his distributees would redistribute.[20] But we worded our holding broadly: "To show a conspiracy, the government must show not only that Lennick gave drugs to other people knowing that they would further distribute them, but also that he had an agreement with these individuals to so further distribute the drugs."[21] In

---

[17] *Lennick*, 18 F.3d at 819.

[18] *Id.* at 818 ("Although an agreement may be inferred from the defendant's acts or from other circumstantial evidence, 'simple knowledge, approval of, or acquiescence in the object or purpose of a conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient.'" (citation omitted) (quoting *United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980))).

[19] *Id.* at 819 (quoting *United States v. Lechuga*, 994 F.2d 346, 347 (7th Cir. 1993)).

[20] *Id.*

[21] *Id.*

so holding, we agreed with the First, Seventh, and Tenth Circuits.[22]

We held in *United States v. Mincoff* that "fronting," which means providing the inventory to the buyer on credit, to be paid after he resells it, could support proof of a conspiracy between the seller and the buyer for the buyer to resell to a third party.[23]   Mincoff, the buyer, ordered very large quantities of cocaine, and Mincoff's seller knew that Mincoff was purchasing "on behalf of [Mincoff's] buyer."[24]   The extension of credit to Mincoff in these circumstances helped to show a conspiracy between the seller and the buyer for the buyer to resell.[25]   After all, it is hard to imagine how Mincoff could have paid his supplier without first selling the inventory bought on credit.   We distinguished *Lennick* based on the large quantities of drugs transferred, the testimony that the seller was acquiring the cocaine for the buyer's subsequent buyers, and the extension of credit to the buyer until he completed the resale.  These facts showed a "shared stake" in the buyer's reselling enterprise amounting to a conspiracy between the seller and the intermediate buyer for the buyer to resell.[26]

---

[22] *See id.* at 819 n.4 (citing *United States v. Moran*, 984 F.2d 1299, 1302 (1st Cir. 1993); *United States v. Fox*, 902 F.2d 1508, 1514–15 (10th Cir. 1990); *United States v. Mancari*, 875 F.2d 103, 105–06 (7th Cir. 1989); *United States v. McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987)).

[23] 574 F.3d 1186, 1192–93 (9th Cir. 2009).

[24] *Id.* at 1190.

[25] *Id.* at 1193, 1195.

[26] *Id.* at 1194.

Applying *Lennick* in *United States v. Ramirez*, we reiterated that

> [t]o prove conspiracy, the government had to show more than that Ramirez sold drugs to someone else knowing that the buyer would later sell to others.  It had to show that Ramirez had an agreement with a buyer pursuant to which the buyer would "further distribute the drugs."[27]

We explained that when deciding if there is sufficient evidence of an agreement, we look for "evidence of a prolonged and actively pursued course of sales coupled with the seller's knowledge of *and a shared stake* in the buyer's illegal venture."[28]  Unlike *Lennick*, which involved small amounts of marijuana, *Ramirez* involved repeated sales of "escalating" quantities of methamphetamine.[29]  But we held that even repeated sales and large quantities could not sustain a conspiracy conviction, in the absence of evidence of involvement of Ramirez in his buyers' drug sales.[30]

*Ramirez* was a stronger case for the government than this one.  Ramirez's buyer collected money from the government undercover agent while Ramirez was nearby and brought the

---

[27] 714 F.3d 1134, 1140 (9th Cir. 2013) (quoting *Lennick*, 18 F.3d at 819).

[28] *Id.* (emphasis added) (quoting *United States v. Thomas*, 284 F.3d 746, 752 (7th Cir. 2002)).

[29] *Id.* at 1136.

[30] *Id.* at 1140.

money immediately to Ramirez. Ramirez exchanged the methamphetamine immediately, which the go-between immediately delivered to the undercover agent.[31] In three out of four of the sales proved, the undercover agent and Ramirez were in sight of each other.[32] Nevertheless, we held that there was insufficient evidence of conspiracy between Ramirez and the go-between.[33] *A fortiori*, the Sanchez group's sales to Loveland, with no involvement in Loveland's resales, does not suffice to establish a conspiracy. In *Ramirez*, the seller had been present for the resale. No one from the Sanchez group observed or was told what Loveland was doing with the methamphetamine.

Subsequently, in *United States v. Moe*, we held that "[d]istinguishing between a conspiracy and a buyer-seller relationship requires a fact-intensive and context-dependent inquiry that is not amenable to bright-line rules."[34] We listed ten factors that might aid in the "holistic" evaluation of sufficiency of evidence.[35] We noted that the prolonged cooperation and mutual coded warning system between the buyer and seller, as well as quantity and frequency of the sales, supported an inference of a shared stake.[36] We noted that "fronting" drugs or supplying them on consignment

---

[31] *Id.* at 1136.

[32] *Id.* at 1140.

[33] *Id.*

[34] 781 F.3d 1120, 1125 (9th Cir. 2015).

[35] *Id.* at 1125–26.

[36] *Id.* at 1126.

would also be strong indicators.[37]  Moe's frequent 600-mile round trips and her frequent texting and talking with her supplier supplied a context from which the jury could infer a stronger relationship than mere buyer and seller.[38]

Though courts once called the "buyer-seller rule" a "narrow exception" to conspiracy,[39] a particularly thoughtful Supreme Court of Connecticut decision, *State v. Allan*, notes that the buyer-seller relationship is a failure of proof of conspiracy, not an exception to conspiracy.[40]  As we held in *Lennick* and reiterated in *Moe*, "conspiracy requires proof of an agreement to commit a crime other than the crime that consists of the sale itself,"[41] and "the government must show that the buyer and seller had an agreement to further distribute the drug in question."[42]  Distribution is a different crime from conspiracy to distribute.  For the seller to be conspiring with the buyer to redistribute, there has to be an agreement, not just surmise or knowledge, between the seller

---

[37] *Id.* at 1125.

[38] *See id.* at 1123.  The distance from Helena, Montana, where Moe lived, to Spokane, Washington, where she drove monthly to purchase the methamphetamine from her supplier, is approximately 300 miles one way.

[39] *Id.* at 1124 (quoting *United States v. Parker*, 554 F.3d 230, 234 (2d Cir. 2009)).

[40] 83 A.3d 326, 333, 339–40 (Conn. 2014).

[41] 18 F.3d 814, 819 (9th Cir. 1994) (internal quotation marks omitted); *Moe*, 781 F.3d at 1124.

[42] *Lennick*, 18 F.3d at 819 n.4; *Moe*, 781 F.3d at 1124–25.

and buyer for the buyer to redistribute.[43]  The agreement is an element of the crime, and has to be proved.[44]

Of course, like any element, the agreement may be proved by direct evidence or circumstantial evidence.[45]  And the agreement can be explicit or tacit.[46]  But the agreement has to be there.  A relationship of mere seller and buyer, with the seller having no stake in what the buyer does with the goods, shows the absence of a conspiracy, because it is missing the element of an agreement for redistribution.[47]  As the Seventh Circuit explained in *United States v. Brown*, "We discuss buyer-seller relationships at such length because they do *not* qualify as conspiracies."[48]

We have mentioned extension of credit or taking the goods on consignment as evidence of an agreement to resell, because of the "shared stake" the seller and buyer have in

---

[43] *Lennick*, 18 F.3d at 819.

[44] *See Moe*, 781 F.3d at 1124.

[45] *See Moe*, 781 F.3d at 1125; *Lennick*, 18 F.3d at 818.

[46] *See Direct Sales Co. v. United States*, 319 U.S. 703, 714 (1943); *United States v. Melchor-Lopez*, 627 F.2d 886, 891 (9th Cir. 1980).

[47] *See Allan*, 83 A.3d at 335 ("[A] mere buyer-seller relationship lacks an essential element necessary to form a conspiracy."); *see also United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013) ("And the government presented no evidence indicating that Ramirez had any kind of involvement in Bejaran's drug sales.").

[48] 726 F.3d 993, 1001 (7th Cir. 2013).

resale.[49]   Like any wholesaler giving credit, the drug buyer
may be unable to pay his wholesaler if he cannot resell his
inventory.  Credit and consignment were absent, though, in
this cash-on-the-barrelhead case.  And we have mentioned the
seller's assistance with the resale as strong evidence of an
agreement to redistribute.[50]  That was also absent here.  And
there was also no evidence here of high pressure sales by
Sanchez,[51] which might support an agreement to redistribute.
Loveland called Sanchez; Sanchez did not call Loveland.
Sanchez offered no incentives for redistribution.[52]  As we
held in *Moe*, there is no bright-line rule, and the decision
whether the evidence would allow any reasonable juror to
conclude beyond a reasonable doubt that there was an
agreement for the redistribution must necessarily be context
dependent and "holistic"—that is, a judgment about the
totality of the circumstances.[53]   The totality of the
circumstances here do not suggest an agreement.  Rather, the
quantities and repeated sales to Loveland would support an
inference that the Sanchez group knew that it was probably
selling drugs to a reseller.  But under *Ramirez*, that is not

---

[49] *See Moe*, 781 F.3d at 1125; *United States v. Mincoff*, 574 F.3d 1186,
1193–94 (9th Cir. 2009); *see also Brown*, 726 F.3d at 999 (in consignment
sales "the buyer and seller have enmeshed their interests").

[50] *See United States v. Lapier*, 796 F.3d 1090, 1095 (9th Cir. 2015);
*United States v. Webster*, 623 F.3d 901, 907 (9th Cir. 2010).

[51] *See Direct Sales*, 319 U.S. at 711.

[52] *Cf. Webster*, 623 F.3d at 907.

[53] *Moe*, 781 F.3d at 1124–25.

sufficient evidence to prove that the Sanchez group agreed with Loveland that he was to redistribute drugs.[54]

We are unable to see how in this case any reasonable juror could conclude beyond a reasonable doubt that the Sanchez group had an agreement, even tacit, with Loveland, for Loveland to resell the methamphetamine. Though the Sanchez group might assume that Loveland was reselling the methamphetamine that he bought from them, he could have flushed it down the toilet for all they cared, since they already had his money.[55] As for future sales, they had no hold on him. Loveland was free to shop elsewhere. Their stake in his enterprise was no different from a big-box store's stake in a convenience store's financial success from the resale of individually packaged peanuts purchased by the carton from the big-box store. The big-box store ordinarily has no agreement with the convenience store owner regarding his resales. As the Seventh Circuit said in *United States v. Colon*, "Every seller to a distributor has a stake in the distributor's activities; a person who buys for resale will not enrich his seller if his resale business dries up."[56] However, we share the Seventh Circuit's skepticism that "'regular' purchases on 'standard' terms can transform a customer into a co-conspirator."[57]

---

[54] *See United States v. Ramirez*, 714 F.3d 1134, 1140 (9th Cir. 2013).

[55] *See United States v. Brock*, 789 F.3d 60, 65 (2d Cir. 2015) (finding that the fact the seller had no interest in what the buyer did with the drugs he purchased and that he viewed the buyer only as a customer vitiated the inference of an agreement to redistribute).

[56] 549 F.3d 565, 568 (7th Cir. 2008).

[57] *Id.* at 567.

There was no evidence of an agreement, so the evidence was insufficient to support Loveland's conspiracy conviction. Therefore, we **REVERSE** the judgment and **VACATE** Loveland's conviction and sentence.