NOT FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

FILED

NOV 3 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-10287 |
| Plaintiff-Appellee, | D.C. No. 1:21-cr-00106-DKW-1 |
| v. | |
| JAMIL JONES, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the District of Hawaii
Derrick Watson, Chief District Judge, Presiding

Argued and Submitted October 5, 2023
Honolulu, Hawaii

Before: BERZON, MILLER, and VANDYKE, Circuit Judges.

Jamil Jones appeals from his conviction and sentencing on two counts of drug distribution and one count of drug conspiracy. For the reasons below, we affirm his convictions and reverse, vacate, and remand his sentence.

1. The district court did not err by admitting lay voice-identification testimony.

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

The government introduced recorded calls between Felix Thaxton—Jones's alleged coconspirator—and a contact known as "Navigator." Agent Gabriel Gray, a nonexpert, testified that "Navigator" was Jones. Gray's "[l]ay opinion . . . [wa]s permissible" because he had the "requisite familiarity with [Jones,] the speaker" he identified. *United States v. Ortiz*, 776 F.3d 1042, 1044 (9th Cir. 2015) (quoting *United States v. Thomas*, 586 F.2d 123, 133 (9th Cir. 1978)). Gray listened to authenticated prison calls Jones made and spent several hours with Jones following his June 2021 arrest. These experiences meet our standard, as Gray "need only be 'minimally familiar with the voice he identifies.'" *Id*. at 1044–45 (quoting *United States v. Plunk*, 153 F.3d 1011, 1023 (9th Cir. 1998)).

2. Jones challenges the distribution of transcripts of the "Navigator" calls, with Jones's name and initials included, to the jury. Because he did not state "specific grounds for his objection" at trial, we review for plain error. *United States v. Gomez-Norena*, 908 F.2d 497, 500 (9th Cir. 1990).

Plain error requires demonstrating, among other factors, that an error "affected [Jones's] substantial rights." *United States v. Johnson*, 979 F.3d 632, 636 (9th Cir. 2020). Even if the district court erred in allowing the transcripts, Jones did not show that such error affected his substantial rights, given Agent Gray's voice-identification testimony, along with other evidence described below connecting

Jones to the phone number used in the recorded calls. *See United States v. Benamor*, 937 F.3d 1182, 1189 (9th Cir. 2019). Admitting the transcripts was not plain error.

3. Nor did the district court plainly err in admitting evidence from a search of Thaxton's Hawaii apartment.

The government presented evidence from the search detailing large amounts of methamphetamine and heroin, over $45,000 in cash, guns, and other drugs. This evidence was "probative of an overall narcotics trafficking conspiracy." *United States v. Crespo de Llano*, 838 F.2d 1006, 1018 (9th Cir. 1987). "[T]he government presented sufficient evidence linking [Jones] to the evidence" in the apartment by demonstrating his role supplying methamphetamine and heroin to Thaxton, including in the June 2021 package. *Id.* Evidence of Thaxton's drug distribution illustrates the downstream aspects of Jones's "narcotics trafficking conspiracy" after the drugs arrived in Hawaii. *Id.*

Courts "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. The search evidence did not unfairly prejudice Jones, as "it was not particularly damning in light of all the other evidence directly relating to [his] charged" drug offenses. *United States v. Anderson*, 741 F.3d 938, 950 (9th Cir. 2013).

Plain error requires Jones to show, among other factors, that "there was an error" that was "clear or obvious." *Johnson*, 979 F.3d at 636. There was no error

here, much less a clear one. Given other evidence that Jones distributed methamphetamine and heroin to Thaxton, evidence from Thaxton's apartment was probative of Jones's conspiracy charge and not unfairly prejudicial.

4. We also hold that each of Jones's convictions is supported by sufficient evidence. 21 U.S.C. § 841(a) requires "pro[of] beyond a reasonable doubt that the defendant (1) knowingly or intentionally (2) distributed (3) any controlled substance." *United States v. Collazo*, 984 F.3d 1308, 1320 (9th Cir. 2021) (en banc) (footnote and internal quotation marks omitted). Viewing the record in the light most favorable to the prosecution, *see United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143 (9th Cir. 2012), a rational trier of fact could find beyond a reasonable doubt the essential elements of (i) distribution of at least 50g of methamphetamine and (ii) distribution of at least 100g of heroin, both in violation of § 841(a).

Considerable evidence showed that Jones shipped Thaxton a package with over 3,000g of methamphetamine and over 2,000g of heroin in June 2021. That evidence included calls in which Jones discussed the package's contents and delivery information in significant detail; text messages from Jones showing the package's tracking number; and an exact match between the packaging materials and items in Jones's father's garage. Trial testimony confirmed the "drug type and quantity" in the June 2021 package. *Collazo*, 984 F.3d at 1322.

Jones disputes his connection to the (213) phone number used in calls and text messages with Thaxton. Jones provided that number to Southwest Airlines when flying to Hawaii and to the state of Hawaii in his COVID-19 paperwork. The number matched the phone found outside Jones's hotel room in Desert Hot Springs, which contained app accounts linked to Jones's full name and the email navigator0071p@gmail.com. And Thaxton identified that number (listed on his phone as "Navigator") as Jones's. In addition to Agent Gray's voice-identification testimony, this evidence sufficiently linked Jones to the drug-related discussions from the (213) number.

Given this evidence, a reasonable trier of fact could conclude beyond a reasonable doubt that Jones was the person who knowingly mailed over 50g of methamphetamine and over 100g of heroin to Thaxton.

5. Sufficient evidence also supports Jones's drug-conspiracy conviction. Viewing the record in the light most favorable to the prosecution, *see Del Toro-Barboza*, 673 F.3d at 1143, a rational trier of fact could find the essential elements of conspiracy to distribute at least 50g of methamphetamine and at least 100g of heroin in violation of 21 U.S.C. § 846. Convicting Jones required "pro[of] beyond a reasonable doubt that (1) [he] agreed with another person that some member of the conspiracy would commit the relevant underlying offense (here [distribution of a controlled substance]), and that (2) [he] had the requisite intent necessary for a

conviction of the underlying offense." *Collazo*, 984 F.3d at 1320. The June 2021 package satisfies the amount and type of drugs charged as the object of the conspiracy.

There was sufficient evidence that Thaxton and Jones—"the buyer and seller," respectively—"had an agreement to further distribute the drug[s] in question." *United States v. Moe*, 781 F.3d 1120, 1124–25 (9th Cir. 2015) (internal quotation marks omitted). Their relationship reflects several "factors that courts have considered relevant" to the existence of an agreement. *Id.* at 1125. In their calls, Jones and Thaxton discussed drug sales and distribution, including coded references to methamphetamine and heroin, and Jones sought Thaxton's appraisal of Hawaii drug-market demand. The calls also evince trust between the two, as shown by Jones's willingness to have Thaxton "sit on that much money" owed to Jones for several weeks, until Jones went to Hawaii and saw Thaxton in person. In text messages going back at least to June 2020, Jones and Thaxton discussed distributing drugs, made arrangements for funds generated by drug sales, and considered forward-looking distribution. Evidence from Thaxton's Hawaii apartment, including large amounts of methamphetamine and heroin and indicia of a Hawaii drug-trafficking operation, further shows the conspiracy's downstream distribution by Thaxton.

6

Considering the "totality of the circumstances," a rational trier of fact could conclude beyond a reasonable doubt that Jones and Thaxton did not have an arms-length buyer-seller arrangement but an ongoing relationship with an "agreement for [Thaxton's] redistribution" of drugs. *United States v. Loveland*, 825 F.3d 555, 562 (9th Cir. 2016). That agreement was evidenced by "the level of trust demonstrated between buyer and seller, including the[ir] use of codes; the length of time during which sales were ongoing," the fact that they "advised each other on the conduct of the other's business" by discussing demand for certain types and volumes of drugs, and the quantity of drugs involved. *Moe*, 781 F.3d at 1125–26 (footnote omitted). Jones's willingness to provide drugs to Thaxton on credit "support[s] proof of a conspiracy between the seller and the buyer for the buyer to resell to a third party." *Loveland*, 825 F.3d at 560; *see Moe*, 781 F.3d at 1126–27 (noting that a seller had an "interest in fostering . . . downstream sales, which created the demand for his repeated sales" to a buyer).

6. Jones also challenges two sentence enhancements.

(a) The district court abused its discretion by applying an enhancement because "a dangerous weapon (including a firearm) was possessed," U.S.S.G. § 2D1.1(b)(1), based on two guns found in Jones's father's garage unit.

Jones was regularly present at his father's Los Angeles residence, where he was relegated to the garage and not permitted in the house. But that garage was also

7

accessible to people other than Jones and contained others' belongings, including his father's I.D. card. No evidence showed that Jones knew the guns were in the garage or was otherwise connected to them. *See United States v. Cazares*, 121 F.3d 1241, 1245 (9th Cir. 1997). In particular, the guns were in a backpack, and the record does not show that the backpack was found near the packaging materials attributed to Jones. "[I]t is pure speculation whether [Jones] . . . ever had possession . . . of any of the firearms." *Id*. The district court abused its discretion in applying the dangerous-weapon enhancement.

The firearms enhancement increased Jones's Guidelines recommendation from 324 to 405 months to 360 months to life. Although his 240-month sentence was below the originally calculated range, "[a] below-Guidelines sentence does not avoid or make harmless an error in the Guidelines calculation." *United States v. Lloyd*, 807 F.3d 1128, 1174 n.19 (9th Cir. 2015). Misapplying the enhancement was thus not harmless error. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1030 (9th Cir. 2011). We therefore reverse, vacate, and remand Jones's sentence.

(b) The district court did not abuse its discretion by applying a sentence enhancement based on Jones "recklessly creat[ing] a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer." U.S.S.G. § 3C1.2. The record supports a determination that,

8

during the car chase preceding his June 2021 arrest, Jones knew he was fleeing specifically from law enforcement.

First, in the week before the chase, Jones had searched for information about Thaxton's recent arrest in Hawaii, indicating knowledge that law enforcement had discovered his drug-distribution network. Second, Agent Gray testified that he heard an officer radio that Jones saw that officer upon arriving at Jones's father's home and then "t[ook] off." Third, when Jones arrived at the home, physical markers indicated the DEA's recent presence, including a missing window and breached door. Finally, Jones's cell phone, which DEA agents were tracking, stopped transmitting shortly after the car chase. This interruption could indicate that Jones turned his phone off because it might be tracking him, a capability that law enforcement officers possess but other pursuers generally would not. Taken as a whole, the record supports the conclusion that Jones knew he was fleeing from the police.

**AFFIRMED IN PART and REVERSED, VACATED, AND REMANDED IN PART.**